THE CITY OF NORWALK.[1]

THE TRANSFER NO. 4 AND THE CAR–FLOAT NO. 16.

McCULLOUGH v. NEW YORK & N. STEAMBOAT CO. et al.

NEW YORK & N. STEAMBOAT CO. v. THE TRANSFER NO. 4 et al.

(District Court, S. D. New York. March 27, 1893.)

1. CONSTITUTIONAL LAW— MARITIME LEGISLATION — STATE STATUTES—MUNICIPAL LAW.
    The law administered in the admiralty courts of this country embraces not merely what is peculiar to the maritime law, but also much of the municipal local law, derived from the constituted order of the state, and all competent state and national legislation. What is peculiar to the maritime law, or that which by its interstate or international relations would be incompatible with diverse state legislation, can be changed by congress alone, which, by implication, has the general power of legislation on the maritime law. This does not exclude state legislation upon maritime subjects of a local nature, nor legislation under the police power for the preservation of life or health, not incompatible with interstate and international interests, in the absence of legislation by congress. A state statute giving damages for death by negligence, as applied to a negligent collision on navigable waters within the state, does not infringe those conditions, and is valid.

[1]Reported by E. G. Benedict, Esq., of the New York bar.

2. ADMIRALTY—ACTION FOR DEATH—STATE STATUTE.
  An action to recover such damages is for a tort which by its nature and locality is a maritime tort, and as such is within the ancient jurisdiction of this court, and equally so whether the right of action is given by state or by federal legislation. Though no lien is raised by implication, the statutory right may be enforced by an admiralty proceeding in personam. The grounds of action are not statutory, but only the right to a remedy, which it is competent for the state to enact in the absence of legislation by congress, and which, under the provisions of the limited liability acts, (Rev. St. U. S. §§ 4283–4285,) as interpreted by the supreme court, it is incumbent on the district court to recognize and enforce.

3. SAME—CONTRIBUTORY NEGLIGENCE.
  Such a suit is subject to the conditions of the state statute. Contributory negligence of the deceased will, therefore, bar recovery in this court, as in the state court.

4. NEGLIGENCE—SEAMAN—SUIT AGAINST HIS VESSEL—FELLOW SERVANT.
  A seaman, as fellow servant, cannot recover against his own ship for damages occasioned by the negligence of any of the ship's company in the details of navigation, the owners being in no personal fault.

5. COLLISION—STEAM VESSELS MEETING—INSPECTORS' RULES.
  A tug, with a car float alongside, bound for the Harlem river out of the channel of the East river between Blackwell's island and the Long Island shore, and a steamboat coming down between Flood rock and Hallett's point, collided by night at a point from one to three hundred feet above the northerly end of Blackwell's island. The vessels saw each other when 700 yards apart, being then nearly head and head. Each mistook the other's intention. The lights were changing, and the evidence conflicting, but neither gave any signal to the other, as required by the inspectors' rules. *Held* that, without considering any of the other faults alleged, both steam vessels were in fault for their failure to signal, and that the locality made signals more than usually imperative; but that no fault was shown in the car float.

6. SAME—DEATH OF SEAMAN—CONTRIBUTORY NEGLIGENCE—LIMIT OF RECOVERY.
  The engineer of the steamboat jumped for the car float at the time of the collision, but fell into the water, and was drowned. On suit by his administratrix against the owners of both vessels, it was claimed that such attempt to jump was negligence contributory to the accident, and that libelant could not recover. *Held*, that if such attempt to jump was an error, it was, under the circumstances, analogous to an error in extremis, for which he was not to blame. Both steam vessels having been found in fault for the collision, *held*, that libelant could not recover from the vessel on which her intestate had been employed, by reason of his relation of fellow servant with those whose negligence had caused the collision; that the liability of the other vessel in collision was not thereby to be increased, but was limited to one half the damages.

In Admiralty. Libel by Mary McCullough, administratrix of Patrick McCullough, against the owners of two vessels, alleging negligent collision by which the intestate lost his life. Libel by owner of one of the vessels to recover damages for collision. Decrees for libelants.

Hyland & Zabriskie, for administratrix.
Owen, Gray & Sturgis, for New York & N. Steamboat Co.
Page & Taft and Wheeler H. Peckham, for New York, N. H. & H. R. R. Co. and for Transfer No. 4 and Car Float No. 16.

BROWN, District Judge. At about half past 3 o'clock in the morning of March 30, 1892, the steam tug Transfer No. 4, having a

railroad car float, 225 feet long, in tow on her starboard side, and projecting about 40 feet ahead of her, was proceeding up the East river against the ebb tide through the easterly channel between Blackwell's island and the Long Island shore, at the rate of about 2 knots per hour by land. She was bound for the New Haven docks· in the Harlem river. The weather was fair; the night starlight, but dark. When near the upper end of Blackwell's island she shaped her course to cross to the westward between the upper end of Blackwell's island and Mill rock, and so into the Harlem river. When from one to three hundred feet above the northerly point of Blackwell's island, the forward end of her float came in collision with the steam propeller City of Norwalk, about 125 feet long, which had come down through the easterly channel between Flood rock and Hallett's point, and was making for the westerly channel between Blackwell's island and the New York shore. The square bow of the float struck the port side of the City of Norwalk, aft of her forward gangway, at an angle of about six points. A considerable part of the side of the City of Norwalk was carried away, and part of her cargo was knocked overboard, or shifted, so that she immediately took a strong list to starboard. She rapidly filled with water, and was soon after beached a short distance below on the Blackwell's Island shore. The fireman and one of the deck hands in alarm jumped from the upper deck of the City of Norwalk to the bow of the float. The engineer, Patrick McCullough, husband of the libelant administratrix, was seen a few moments after to jump for the float from the rail of the steamer on the main deck; but failing to reach the float, he fell into the water and was drowned. The libelant sued under the state statute to recover damages for his death, as having been caused by the negligence of all the vessels. The steamboat company also filed its libel *in rem* against the Transfer No. 4 and the float, for the damages sustained by the City of Norwalk.

The tide was ebb at the time of the collision, and being about an hour before low water, the current was probably not less than 4 knots. The City of Norwalk, which did not slacken her full speed of about 8 knots, was, therefore, coming down at the rate of about 12 knots by land, and was making, therefore, about six times the speed of the tug and tow by land. When the former was abreast of Flood rock, she was about 550 yards from the place of collision, while the latter could not then have been more than about 90 yards from it. The lights of all the boats were properly burning.

1. In those positions, if the vessels had followed the usual courses, the pilot of the Norwalk should have seen the green light of the tug, and the tug should have seen the red light of the City of Norwalk. The witnesses on both boats, however, testify in the most positive manner that the lights seen at that time were precisely the reverse; the steamer showing only her green light, and the tug, her red light. Accordingly, the pilot of the tug testifies that he supposed the steamer was going down the easterly channel between Blackwell's island and the Long Island shore; while the pilot of the steamer testifies that he supposed the tug was intending to keep up by the As-

toria shore, to go between Flood rock and Hallett's point. Those are the reasons stated by each for not giving the signals required by the inspectors' rules. Each testifies that subsequently the other gave a sheer across his bow, and thus brought about collision. A whistle was given by the City of Norwalk just before collision. But the evidence shows that the boats were then so near that the signal was of no use; and on account of their nearness, also, the Norwalk did not reverse, but kept on at full speed, as offering the only chance of escape.

Each, also, contradicts the other as to the positions of the boats respectively at the time they were first seen. But I do not find it necessary to determine the precise positions of either vessel in the channel, or the lights which at different times might have been exhibited to each other; for both were swinging more or less, and different lights were no doubt exposed to view at different times during a short interval. Independently of these controverted points, there is sufficient to charge both the steamer and the tug with fault; because it was a misunderstanding by each as to the supposed intent of the other, that caused the collision; and this misunderstanding could not possibly have happened had either given the signals required by the inspectors' rules.

The vessels were visible to each other, and were probably seen by each other, when at least 700 yards apart, the steamer being then a little above Flood rock, and the tug a little below the Blackwell's Island light. As respects the line of the channel, the two were very nearly ahead of each other, although from some swinging by each, they may each have borne somewhat on the other's bow. The inspectors' rules imperatively required a signal to be given; and the circumstances were such as made the omission of signals in this case specially dangerous and reprehensible. The tug was recognized as having a railroad float in tow, bound for the Harlem river. Even if the custom had been fixed and invariable for such tows to proceed up the easterly channel between Flood rock and Hallett's point, the rule would have still required signals to be given. . But there was no such invariable custom, and the frequent practice of going to the southward of Little Mill rock in the nighttime made it at least uncertain which course the tug and float would pursue. In passing around curves and through so swift a current, there was from the first the greatest danger of collision unless a common understanding was had. Neither had any right in such a situation as Hell Gate to trust to mere inference derived from the light seen, or the supposed position at a particular moment. The Transfer No. 5, 49 Fed. Rep. 398. The rules as to signals are designed for the purpose of securing a common understanding and of preventing just such mistakes as the present. The Connecticut, 103 U. S. 710, 713; The Ice King, 52 Fed. Rep 894, and cases there cited. The duty to give such a signal rested upon each alike, and both are alike to blame for the omission. Without considering, therefore, any other faults alleged against Transfer No. 4, and the City of Norwalk, those vessels must both be held liable; but not the car float, as no fault in her is proved.

The New York & Norwalk Steamboat Company is, therefore, entitled upon its libel to a decree for one half its damages and costs.

2. The other libel is brought by the administratrix, for damages for the death of her husband, the engineer of the City of Norwalk. It has been held in this district and circuit in a number of cases that a seaman cannot recover against his own ship for damages occasioned by the negligence of any of the ship's company in the details of navigation, such as the omission of proper signals, as in the present case, the owners being in no personal fault. Even the officers, in the performance of the ordinary duties of navigation do not stand as the representative, or *alter ego*, of the owners as respects the other employes on board. As respects such details, all are engaged in one common employment, viz. the navigation of the ship, in their several grades, and each person so employed takes the risk of any negligence of the other in the common employment. The Queen, 40 Fed. Rep. 694; The Frank and Willie, 45 Fed. Rep. 494, and cases there cited; Quinn v. Lighterage Co., 23 Fed. Rep. 363. And such in effect is the decision of the supreme court in the case of Steamship Co. v. Merchant, 133 U. S. 375, 378, 10 Sup. Ct. Rep. 397. See, also, Hedley v. Steamship Co., [1892] 1 Q. B. 58. The deceased being, therefore, disabled from recovering anything from his own ship by reason of his special relations to her as a fellow servant, as respects her share in causing the collision, must be limited to a recovery of only one half his damage against Transfer No. 4; since the latter cannot be prejudiced, nor her liability be increased, by reason of that disability. The Queen, supra.

3. It is further contended that the administratrix can recover nothing from Transfer No. 4, because the deceased lost his life through his own contributing negligence in attempting to jump from the City of Norwalk to the float, when the circumstances made such an attempt dangerous. The right of action conferred by the statute is upon condition that "the deceased, if living, might himself have maintained an action" for his damages. By the law of this state the plaintiff's contributory negligence bars his recovery; and such contributing negligence, if found, must, therefore, bar any recovery by the administratrix in an action in this court based upon the state statute. The Harrisburg, 119 U. S. 199, 214, 7 Sup. Ct. Rep. 140; The A. W. Thompson, 39 Fed. Rep. 115. I am of the opinion, however, that the attempt of the deceased to jump to the float should not be treated as a legal fault, though a mistake, and an error of judgment. He had doubtless seen one or both of his shipmates jump just before. Coming suddenly from the engine room immediately upon the crash of the collision, when a considerable part of the side of the steamer had been carried away, and in the alarm attending such a catastrophe in the night-time, there was no time nor opportunity for the exercise of deliberate judgment, and his act should, I think, be treated as errors *in extremis* are treated, viz. as a mistake made under the apprehension of immediate danger, for which those who wrongfully

brought about the situation, and not himself, should be held to blame.

4. It is further contended that there can be no recovery for loss of life in this court, because there is no liability therefor under the general maritime law of this country, (The Harrisburg, 119 U. S. 199, 7 Sup. Ct. Rep. 140; The Alaska, 130 U. S. 201, 9 Sup. Ct. Rep. 461;) and because, as it is said, it is not competent for state legislation (1) to change the law in maritime cases, or (2) to extend the jurisdiction of a court of admiralty so as to authorize it to enforce a new and purely statutory cause of action.

The question raised is doubtless a most important one. It has not been directly adjudicated in the supreme court. In the case of The Corsair, 145 U. S. 335, 12 Sup. Ct. Rep. 949, it was held that a suit *in rem* would not lie where the state statute gave no lien, thereby confirming the decision of Judge Benedict in The Sylvan Glen, 9 Fed. Rep. 335, and that of Judge Butler in The North Cambria, 40 Fed. Rep. 655. In his opinion in the latter case, Judge Butler observes, that if the state statute indicated a purpose to *create* such a *lien*, he would "hold the statute to be inoperative in this respect." "The states," he says, "have no power to interfere with the admiralty system of laws; they can add nothing to it, nor take anything from it. The subject lies within the exclusive domain of congress." Judge Hughes, also, in the case of The Manhasset, 18 Fed. Rep. 918, says, that "the state cannot create a maritime right or confer jurisdiction, in any particular, upon an admiralty court," (page 923;) that the instances to the contrary, such as state statutes giving liens for supplies to domestic vessels, and actions for half pilotage where no services are rendered, are anomalous exceptions; and that "rights created by state statute, unless identical with maritime rights, are *not maritime*," (page 927.) And in the recent case of Ingebregtsen v. Nord Deutscher Lloyd S. S. Co., before Judge Green in the district of New Jersey, an action *in personam*, which, from the record submitted to me, seems to be in all respects analogous to this, was dismissed, on exceptions, for want of jurisdiction. No written opinion was delivered. This is the only case I have found in which an action *in personam* in such a case as this has been dismissed on that ground.

There have been a number of cases, on the other hand, in which the validity of such state statutes and the jurisdiction of a court of admiralty to enforce them have been considered, and upheld. Among these are the cases of Holmes v. Railway Co., 5 Fed. Rep. 75, and The Oregon, 45 Fed. Rep. 62, 77, before Judge Deady; The Garland, 5 Fed. Rep. 924, 927, before the present Mr. Justice Brown; In re Long Island, etc., Transp. Co., Id. 599, 608, 609, in this court before Judge Choate; The Sylvan Glen, 9 Fed. Rep. 336, before Judge Benedict; and The St. Nicholas, 49 Fed. Rep. 671, 677-679, before Judge Speer.

Besides these, there have been many other cases in which the right conferred by the state statutes to damages for death caused by negligence has been enforced in admiralty without question; in

this circuit, among other cases, that of Felty v. Steamship Co., 29 Fed. Rep. 332, affirmed on appeal by Mr. Justice Blatchford, 32 Fed. Rep. 112, where, as I am informed, the point was argued, but not considered in the opinion; and in Daly v. Railroad Co., 44 Fed. Rep. 693, affirmed, on this point, in the court of appeal, 49 Fed. Rep. 956, 959, 1 C. C. A. 483, 486. And in the supreme court, although the question has been several times referred to, without adjudication, yet in the last case on the general subject, (The Corsair, 145 U. S. 335, 347, 12 Sup. Ct. Rep. 949,) both the validity of such state legislation, and the jurisdiction of the district courts to enforce it by libel *in personam* seem directly affirmed. Mr. Justice Brown, in delivering the opinion of the court, says:

"If it [the local law] merely gives a right of action *in personam*, for a cause of action of a maritime nature, *the district court may administer the law by proceedings in personam.*" Page 347, 145 U. S., and page 952, 12 Sup. Ct. Rep.

Mr. Justice Gray, also, sitting in the court of appeal in the subsequent case of The H. E. Willard, 52 Fed. Rep. 387, after stating that the admiralty jurisdiction conferred by the constitution cannot be enlarged or restricted by state legislation, says:

"When a right maritime in its nature has been created by the local law, the admiralty courts of the United States may doubtless enforce that right according to their own rules of procedure;" citing The Corsair, supra, and other cases.

Against the power of state legislation in such matters, the doubts expressed by Mr. Justice Bradley in the opinion in the case of Butler v. Steamship Co., 130 U. S. 527, 9 Sup. Ct. Rep. 612, are cited; in which, after stating that the limited liability act applies to an action brought in a state court under a state statute to recover damages for death caused by negligent navigation within the state limits, he says:

"It might be a much more serious question whether a state law can have *force to create a liability in a maritime case at all,* within the dominion of the admiralty and maritime jurisdiction, where neither the general maritime law nor an act of congress has created such a liability. On this subject we prefer not to express an opinion."

But in the case of The Corsair, three years later, the opinion of the supreme court does not continue the expression of such doubts; and what is said, though *obiter*, is plainly in support of the maintenance of such libels *in personam*.

Aside from this expression, however, it seems to me that the previous decisions of the supreme court had substantially covered the case, both as to the competency of the state to create the right, and of a court of admiralty to enforce it.

If it was not within the power of the state "to create such a liability in a maritime case *at all,*" but within the power of congress alone, then clearly the statutes of all the 30 or more states creating such a liability would be void, so far as they relate to deaths in collision cases arising on navigable waters. For all such waters are within "the dominion of the admiralty and maritime jurisdiction," and no action, therefore, in such cases, could be sustained in the state courts any more than in the courts of admiralty. But the validity

of judgments giving damages in the state courts in such cases and the validity of the statutes on which they were founded, have been twice directly and expressly adjudged: First, in Steamboat Co. v. Chase, 16 Wall. 522, and afterwards in Sherlock v. Alling, 93 U. S. 99. These suits arose on writs of error to judgments in the state courts of Rhode Island and Indiana for deaths in collision cases like the present, based upon similar statutes of those states. In the former case, the validity of the act was attacked as an encroachment on the admiralty and maritime power of congress; in the latter, as an encroachment on the commercial power. In both cases the validity of the statutes was upheld. In the latter, the careful opinion delivered by Mr. Justice Field contains what seems to me a full answer to all objections against the authority of the states to pass statutes of this character. He says:

The act " only declares a general principle respecting the liability of all persons within the jurisdiction of the state for torts resulting in the death of parties injured. And in the application of the principle it makes no difference where the injury complained of occurred in the state, whether on land or on water. General legislation of this kind, prescribing the liabilities or duties of citizens of a state, without distinction as to pursuit or calling, is not open to any valid objection because it may affect persons engaged in foreign or interstate commerce. Objection might with equal propriety be urged against legislation prescribing the form in which contracts shall be authenticated, or property descend or be distributed on the death of its owner, because applicable to the contracts or estates of persons engaged in such commerce. * * * But with reference to a great variety of matters touching the rights and liabilities of persons engaged in commerce, either as owners or navigators of vessels, the laws of congress are silent, *and the laws of the state govern. The rules for the acquisition of property by persons engaged in navigation, and for its transfer and descent, are, with some exceptions, those prescribed by the state to which the vessels belong; and it may be said, generally, that the legislation of a state, not directed against commerce or any of its regulations, but relating to the rights, duties and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit. In our judgment, the statute of Indiana falls under this class.* Until congress, therefore, makes some regulation touching the liability of the parties injured, *we are of opinion that the statute of Indiana applies, giving a right of action in such cases to the personal representatives of the deceased;* and that, as thus applied, it constitutes **no** encroachment upon the commercial power of congress." Pages 103, 104.

Aside from the grant of power to regulate foreign and interstate commerce, the constitution, it must be remembered, contains no direct grant to congress of legislative power over the maritime law. Its authority upon that subject, over and above the power derived from the commercial clause, though no doubt now firmly established, (Butler v. Steamship Co., 130 U. S. 527, 9 Sup. Ct. Rep. 612; In re Garnett, 141 U. S. 1, 14, 11 Sup. Ct. Rep. 840,) rests upon implication only.

The grounds of this implication, briefly stated, are that the constitution, in extending the judicial power to all cases of maritime jurisdiction, presupposes a certain body of maritime law as its necessary attendant; that this law is not only a matter of interstate and international concern, but requires, also, harmony and consistency in its administration, and hence cannot be subject to defeat or impairment by liability to the diverse legislation of numerous

states; and that it cannot be supposed that the states, in parting with all control over the judicial administration of maritime causes, intended to reserve to themselves a general legislative power over the same subject; and that congress must, therefore, be the only body competent to make any needed changes in the general rules of the maritime law.

This view, however, does not exclude state legislation upon matters of merely local concern, which can be much better cared for under state authority, and which have always been thus cared for; nor does it exclude general legislation by the states, applicable alike on land and water, in their exercise of the police power for the preservation of life and health, though incidentally affecting maritime affairs; provided that such legislation does not contravene any acts of congress, nor work any prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations. The long-established doctrine in the supreme court has been that in this field of "border legislation," state laws are valid until congress interposes, and thereby excludes further state legislation. The Lottawanna, 21 Wall. 558, 581; Cooley v. Port Wardens, 12 How. 299; County of Mobile v. Kimball, 102 U. S. 691, 697–699; Bowman v. Railroad Co., 125 U. S. 507, 8 Sup. Ct. Rep. 689, 1062; Leisy v. Hardin, 135 U. S. 100, 120–122, 10 Sup. Ct. Rep. 681; Manchester v. Massachusetts, 139 U. S. 240, 266, 11 Sup. Ct. Rep. 559; Ficklen v. Taxing Dist., 145 U. S. 1, 12 Sup. Ct. Rep. 810. There is no reason why local state legislation should be deemed any more restricted by the *implied* power of congress over maritime legislation, than it is by the *express* grant of *the commercial* power. That the rule should be the same on each subject was intimated by Chief Justice Marshall in U. S. v. Bevans, 3 Wheat. 385, and by Mr. Justice Curtis in Smith v. State of Maryland, 18 How. 71, 76. The subject has been but little discussed, as compared with the frequent review of the commercial power of congress and its limitations.

The instances, however, in which *new legal rights*, created by state authority in maritime affairs, have been recognized and enforced, are numerous and diverse. They embrace—First, liens for *supplies* to domestic vessels, (The Lottawanna, 21 Wall. 558;) second, liens for *master's wages*, (The Mary Gratwick, 2 Sawy. 342, affirmed by Mr. Justice Field; The Louis Olsen, 52 Fed. Rep. 652; The J. E. Rumbell, [March 6, 1893,] 13 Sup. Ct. Rep. 498;) third, liens for damages for *refusing to load* under a charter, (The J. F. Warner, 22 Fed. Rep. 342, by Mr. Justice Brown;) fourth, liens for *double* wharfage, (The Virginia Rulon, 13 Blatchf. 519;) fifth, actions for half pilotage where a pilot's services were *refused*, (Ex parte McNiel, 13 Wall. 236, and Ex parte Hagar, 104 U. S. 520, re-affirming Cooley v. Port Wardens, supra;) sixth, liens for expenses of seamen at a quarantine *hospital*, (The Wensleydale, 41 Fed. Rep. 829;) seventh, regulations as to *rivers, harbors*, and *wharves*, (County of Mobile v. Kimball, supra; Escanaba & L. M. Transp. Co. v. Chicago, 107 U. S. 678, 2 Sup. Ct. Rep. 185;

Transportation Co. v. Parkersburg, 107 U. S. 691, 701-704, 2 Sup. Ct. Rep. 732; Packet Co. v. Keokuk, 95 U. S. 80; Packet Co. v. Aiken, 121 U. S. 444, 7 Sup. Ct. Rep. 907; Steamship Co. v. Pennsylvania, 122 U. S. 326, 346, 7 Sup. Ct. Rep. 1118; eighth, *penalties* imposed for the protection of *fisheries*, (Manchester v. Massachusetts, supra; Smith v. State of Maryland, 18 How. 71;) ninth, *quarantine* laws, (Morgan's L. & T. R. & S. S. Co. v. Louisiana Board of Health, 118 U. S. 455, 6 Sup. Ct. Rep. 1114;) tenth, regulating the *charges* of *floating elevators*, (Budd v. New York, 143 U. S. 517, 12 Sup. Ct. Rep. 468;) eleventh, establishing and regulating *ferries*, (Gibbons v. Ogden, 9 Wheat. 1, 203; Conway v. Taylor, 1 Black, 603; Wiggins Ferry Co. v. City of East St. Louis, 107 U. S. 365, 2 Sup. Ct. Rep. 257; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 204, 214-217, 5 Sup. Ct. Rep. 826.)

Besides these new rights created, of so diverse a character, there are many other local regulations established under state authority, concerning the navigation of rivers and harbors, anchorage grounds, port wardens, navigation about piers and slips, and wharf and ferry privileges, which give birth to many specific rights that are constantly recognized and enforced in the trial of admiralty causes. These acts rest either upon the police power of the states, or on the local nature of the subject, and the absence of any legislation by congress on the same matter. Gloucester Ferry Co. v. Pennsylvania, ut supra. They show that over quite a wide range of local interests, state legislation is competent to deal with purely maritime subjects, and to create rights and duties which must be recognized in admiralty causes, though they may not change any of the characteristic principles of the maritime law.

Still further, it must be borne in mind that the maritime law is not in itself a complete and perfect system. In all maritime courts there is a considerable body of municipal law that underlies the maritime as the basis of its administration. Strictly speaking, the maritime law is that alone which is peculiar to, or which specially concerns, maritime transactions. The general body of the law as regards the ordinary, fundamental rights of persons and property, whether on land or sea, is, as observed by Mr. Justice Field in the passage above quoted, derived from the constituted order of the state, i. e. from the municipal law, which courts of admiralty to a considerable extent must necessarily adopt and follow, subject only to the modifications which the special characteristics of the law of the sea impose on maritime subjects. These general rights and regulations of persons and property are subject to the control of the state and may be changed as the state sees fit, if they are not regulated by congress and do not trench upon its exclusive authority. The administration of the law in the maritime courts of different countries, therefore, though it might be the same in all that is peculiar to the maritime law, might in other respects differ widely, through the differences in the municipal law which in part enters into the adjudication of maritime causes.

It was upon the recognition of this principle alone, as I understand, that in the case of The Harrisburg, 119 U. S. 199, 213, 7 Sup.

Ct. Rep. 140, it was decided that no action could be maintained in a court of admiralty of this country for loss of life, aside from statutory authority; namely, because there is no rule on this subject belonging specially to the maritime law as such. "It [the maritime law] leaves the matter untouched." Page 213, 119 U. S., and page 146, 7 Sup. Ct. Rep. And since the maritime courts in each country follow their own municipal law as regards giving damages for death; and inasmuch as by the common law of this country such a cause of action does not survive,—the latter rule must, therefore, obtain in our courts of admiralty. In other words, it is the municipal law that on such a point determines the law applicable in a court of admiralty.

There seem, therefore, to be at least three classes of subjects, (none of them affecting, however, what is peculiar to the general maritime law, or touching its international or interstate relations,) in which state legislation is competent to affect the rights of parties in courts of admiralty, in the absence of legislation by congress, viz.: (1) In the establishment of the general rights of persons and property within the state limits; (2) in the exercise of the police power; (3) in certain local regulations of a maritime nature.

The statute of this state which authorizes a recovery of "the pecuniary damages," "in behalf of a widow, husband, children or next of kin," falls within each of the above classes. (1) It is a general law of personal rights, not specially directed to commerce or navigation, but applying alike on sea or shore; (2) it is within the police power; for it is "a statute intended to protect life," (Huntington v. Attrill, 146 U. S. 657, 675, 13 Sup. Ct. Rep. 224,) through one of the most effectual of all sanctions, viz. by imposing on the offender a liability to pay a pecuniary indemnity; while in the interest of the public, it also tends to avert the dependency or pauperism of the survivors by shifting the burden of their support, in part at least, from the community to the authors of the wrong; (3) it is local in its scope and interferes in no way with any needful uniformity in the general law of the seas, or with international or interstate interests. Its validity, therefore, as applied to maritime affairs within the state limits, seems to me clear.

5. *Jurisdiction.* This court has jurisdiction of the cause, from the nature of the subject, and from the place where, and the causes out of which, the claim arises. The claim is for damages growing out of a tortious collision, through faults of navigation, arising on navigable waters of the United States. That is a purely maritime transaction. The case is, therefore, a maritime case; and as such, it is within the original field of the jurisdiction of this court, as established under the constitution and the judiciary act. The court has authority, therefore, to hear and to determine the cause, whether the law applicable to it entitles the libelant to any damages or not. The latter question is wholly different from the question of the jurisdiction of the court. If the state statute has force to affect this transaction as a maritime case, then this court, in hearing the cause, must give effect to the state law. If the

state act is not competent and has no such force, then this court must disregard it. In either case, the court has jurisdiction to hear and determine the cause on its merits as a maritime cause, and is bound to apply whatever law is operative upon it.

This was the precise point adjudicated in Ex parte Gordon, 104 U. S. 515, and in Ex parte Ferry Co., Id. 519, where a writ of prohibition was denied in each cause on the sole ground that the case was by its nature one that the district court had authority to hear and determine. It would, indeed, be a singular anomaly in our jurisprudence if, under state legislation, the state courts could entertain suits that the admiralty courts could not entertain in collision causes, which from time immemorial have been among the characteristic subjects of maritime jurisdiction.

It is urged that the death claim is purely statutory, and *not maritime*, and hence not cognizable in this court; that state legislation cannot create a new maritime cause of action; and that to execute state statutes would be to extend the jurisdiction of the court, which, it is conceded, state legislation cannot do. But these objections seem to me to be all virtually covered by what has just been said; and to have been repeatedly overruled in substance by the supreme court.

The state statute does not create the *cause* of action. It does, indeed, create a new *right*, and liability; but it does not create a single one of the elements that make up the fundamental cause of action, that is, the essential grounds of the demand. All these elements exist independently of the statute, and are not in the least affected by it. It no more creates the wrong, or the damage, than it creates the negligence or the death; nor does it, as in the pilotage and double wharfage cases, add anything to the damages sustained. It authorizes no recovery except for "the pecuniary damages" already existing. It is apparent, therefore, that, as suggested by Mr. Justice Clifford in Steamboat Co. v. Chase, 16 Wall. 532, the statute does no more than "take the case out of the operation of the common-law maxim that an action for death dies with the person."

The effect of the statute is to attach a new legal right and responsibility to a purely maritime transaction. But that does not make the case in its essential nature any the less a *maritime* case. Nor does the enforcement of the statute extend the jurisdiction of the court, any more than the giving of damages for the first time for injuries to a cargo of dynamite or petroleum would be an extension of jurisdiction because those articles were new to commerce. Ex parte McNiel, 13 Wall. 236, 243; The Oregon, 45 Fed. Rep. 62, 77; Dennick v. Railroad Co., 103 U. S. 11, 17-18, by Mr. Justice Miller.

If the mere fact that the rights or responsibilities sought to be enforced were created by new legislation, made actions brought to enforce those rights no longer truly maritime, but purely statutory, in the sense of the objection here considered, and therefore outside of the jurisdiction of this court, then all rights based on any new legislation, either by the states or by congress in maritime

affairs, would be equally outside of the jurisdiction of this court to enforce; since it is not within the power of congress any more than of the states, to extend the admiralty jurisdiction of this court to matters not really maritime.

On that theory the law of our admiralty courts would be unalterable, and statutes such as those limiting the liability of shipowners, would not be enforceable in this court. The objection is plainly mistaken. Mr. Justice Bradley, in referring to this point in the case of The Lottawanna, 21 Wall. 576, says:

"The law of the admiralty courts depends upon what has been received as law in the maritime usages of this country, *and on such legislation as may have been competent to affect it;* * * * it cannot be supposed that the framers of the constitution contemplated that the law should forever remain unalterable."

The principle, indeed, is now well settled, that the federal courts may enforce rights newly created either by the states or by congress, which by reason of their subject or the relations of the parties, fall within any branch of the federal jurisdiction; and that such jurisdiction cannot be restrained even by the express enactment of the state statute. Railway Co. v. Whitton, 13 Wall. 270, 286; Ellis v. Davis, 109 U. S. 485, 497 et seq., 3 Sup. Ct. Rep. 327; Providence, etc., Co. v. Hill Manuf'g Co., 109 U. S. 589, 3 Sup. Ct. Rep. 379, 617; Dennick v. Railroad Co., 103 U. S. 11, 17–20; and see cases collected in 1 Fost. Fed. Prac. § 7. Maritime legislation by congress and by the states has accordingly been frequent and copious; and in the great majority of current admiralty causes, the rights and obligations of the parties are either created or largely modified by national or state legislation, enacted since the adoption of the federal constitution.

The amendment of the law applicable to a maritime case, or the creation of new rights or responsibilities in maritime affairs, by any competent legislation, state or national, therefore, does not make the claim under it any the less maritime; nor withdraw the case from the jurisdiction of this court. The question really returns to the competency of state legislation to affect the law applicable to a maritime transaction; and that such legislation is competent, under certain narrow limits and restrictions which this statute does not transgress, is, it seems to me, sufficiently clear for the reasons above stated.

The objection that the case is not a *marine* tort, but only a statutory one, is of the same nature as the objection last considered. Before the statute, the case was *damnum absque injuria;* by the statute, it became at once a tort in the full legal sense, and a *marine tort* by reason of its place, its nature, and its circumstances, within the definition given by Mr. Justice Blatchford in Leathers v. Blessing, 105 U. S. 626, 630, and as stated also in previous decisions. New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. 344, 394.

It may be said that if the case under the statute constituted a marine tort, a *lien* by implication would have been allowed by the supreme court in the decision of The Corsair, upon the analogy of

liens allowed in other cases of marine torts, though the state statute gave no express lien; and that the refusal by the supreme court to recognize any implied lien is, therefore, by implication, a decision that the case is not one of a marine tort. But there is no general rule of the maritime law that attaches a lien or privilege to personal torts. Rule 16 in admiralty provides, on the contrary, that for "assault or beating on the high seas, the suit shall be *in personam* only." And in the maritime codes of all the principal maritime countries for more than 200 years at least, no lien or privilege for pure torts, or for damages arising from collision, except as regards injuries to the ship's own cargo involving a breach of her contractual relation, has ever been allowed, until within a recent period in England and this country, and in a few recent codes, which have allowed in collision cases a privilege of a very low rank. See The Young America, 30 Fed. Rep. 799; The Gratitude, 42 Fed. Rep. 299. The establishment of a lien in England for collision damages to property, (The Bold Buccleugh, 7 Moore, P. C. 267, (apparently arose through a misinterpretation of the meaning of the ancient practice of the proceeding *in rem*, which, as pointed out by President Jeune in The Dictator, [1892] Prob. Div. 304, did not involve the existence of any lien or privilege on the ship, in the sense in which we now understand it; but was only a means of compelling an appearance, and included a special citation to the master, as in the continental practice. 2 Brown, Civil Law, 397; The Sloop Merchant, Abb. Adm. 5; Mar. Col. (2d Ed.) 73. Precisely how or when the practice arose of dropping the personal defendant in suits in the English admiralty, is not now determinable; but it was during the long controversy between the admiralty and common-law courts; and it was probably a mere device of the admiralty courts to avoid the persecution of prohibitions, which were not issued where no personal judgment was asked or rendered. Zouch, Adm. 125. Taking the maritime law as a whole, a lien or privilege for personal torts, or even for damages to property, save the ship's own cargo, is the exception and not the rule; and by the recent act of congress, approved February 13, 1893, such liens arising from faults or errors of navigation, after July 1st, may possibly be held to be entirely abolished in this country.

It is evident, however, that the supreme court, in the case of The Corsair, did not deem it necessary to consider at all this phase of the case; but chose to look upon the state statute, not as establishing any general principle upon which remedies were to be extended by analogy, but as giving merely a particular remedy, which was to be enforced in the manner, and with the conditions and limitations, provided by the statute. The Corsair, 145 U. S. 347, 12 Sup. Ct. Rep. 949; The Harrisburg, 119 U. S. 199, 214, 7 Sup. Ct. Rep. 140.

That a new right is none the less maritime because based upon state legislation, where the subject-matter is maritime, was necessarily involved in the very recent case of The J. E. Rumbell, (in the supreme court, March 6, 1893,) 13 Sup. Ct. Rep. 498. There the priority of a lien, created by the statute of Illinois, for supplies and master's wages, as against a prior recorded mortgage,

has been most elaborately and broadly treated by Mr. Justice Gray. Conceding that neither the lien nor the jurisdiction of the court to enforce it, could be sustained except upon its maritime character, the court repeatedly affirmed, and the decision was based upon this ruling, that the lien, though resting wholly upon the state statute, was "in the nature of a maritime lien," and, therefore, enforceable in the district court and entitled to priority over the previous mortgages; thus settling not only the long-vexed question of the right of priority, but the *maritime nature* of the state lien itself. (The Madrid, 40 Fed. Rep. 677; The Lyndhurst, 48 Fed. Rep. 839, 842; The Samuel Marshall, 49 Fed. Rep. 754, 758, affirmed 54 Fed. Rep. 396, 401.) The court says:

"The contract in each case is maritime; and the lien which the law gives to secure it, is maritime in its nature, and enforced in admiralty by reason of its maritime nature only."

So in the present case, it may be said, that the negligence is maritime, and the right or remedy which the law gives to redress it, is maritime in its nature, and is enforced in admiralty by reason of its maritime nature only. The difference where the original subject-matter and the essential cause of action are not maritime, is clearly pointed ,out by Judge Webb in the case of The H. E. Willard, 53 Fed. Rep. 599, affirmed 52 Fed. Rep. 387. The recent decisions of the supreme court do not, therefore, warrant the inference that a death claim is not to be treated as a marine tort, and therefore not cognizable in this court; but they appear to me to support the opposite view.

In the case of The Harrisburg, 119 U. S. 199, 7 Sup. Ct. Rep. 140, the libel was dismissed, not because of any lack of jurisdiction, but because of the absence of any act of congress creating the right; and because "the maritime law, as accepted and received by maritime nations generally, *leaves the matter untouched,*" and the consequent absence of any distinct rule in the maritime code; and therefore the courts of admiralty, it was held, must take their rule on that subject from the municipal law. From that decision it necessarily follows, that within the sphere in which the municipal law is valid and operative, viz. within the navigable waters of the state, the state law, in the absence of any act of congress, as to the survival of any such right of action, or any distinctively maritime rule applicable to the case, must furnish the rule of law as to the right of recovery. And this in effect is precisely what was said and applied in the case of The Corsair.

Finally, it is now settled, that the provisions of the acts of congress limiting liability in matters of navigation, apply to death claims like the present when brought in the state courts; that such claims are within the *language* of section 4283, Rev. St., and that they are *constructively* within sections 4284 and 4285; that such suits in the state courts may, therefore, be enjoined, and the litigation and the adjustment of all such claims transferred to the courts of admiralty. Butler v. Steamship Co., 130 U. S. 527, 551, 9 Sup. Ct. Rep. 612; Craig v. Insurance Co., 141 U. S. 638, 12 Sup. Ct. Rep. 97.

These acts, as thus construed by the highest authority, are alone sufficient to show the will of congress that the district courts shall take cognizance of claims like the present. If such claims are valid, and may be rightfully prosecuted to judgment in the state courts, as the supreme court has repeatedly determined, then the right to prosecute them in the state courts cannot be enjoined by the district courts under the limited liability acts, unless the demands come within the jurisdiction of the district courts; nor unless the latter at the same time take on themselves the recognition and the enforcement of these demands. See The St. Nicholas, 49 Fed. Rep. 671, 677. But besides that, inasmuch as these death claims are now held by the supreme court to be by construction within the provisions of section 4284, Rev. St., it follows that such claimants must have the right to the remedy which that section gives; and they may, therefore, at once file a libel in the district court to establish their own claims, and at the same time bring in all other creditors entitled to share in a *pro rata* distribution. The Scotland, 105 U. S. 24, 25; The Dimock and The Alva, 32 Fed. Rep. 598, 599. Since, therefore, under the provisions of the acts of congress, the recovery of damages for death in maritime cases may be wholly withdrawn from the state courts, by order of the admiralty courts, after the actions are begun in the state courts, or may be prosecuted in the first instance in a court of admiralty for a *pro rata* distribution, citing all claimants to appear, it is evident that a court of admiralty must have jurisdiction over the whole subject, and may award the damages given by the state statute upon a simple libel, as the greater includes the less.

The administratrix is entitled to a decree against the railroad company for $2,500, with interest and costs; and the steamboat company to a decree for half its damages against Transfer No. 4. A reference may be taken therein to compute the amount if not agreed upon.