THE TRANSFER NO. 4 and THE CAR FLOAT NO. 16.

McCULLOUGH v. NEW YORK, N. H. & H. R. CO. et al.

NEW YORK & N. STEAMBOAT CO. v. THE TRANSFER NO. 4 et al.

(Circuit Court of Appeals, Second Circuit, April 19, 1894.)

Nos. 61 and 92.

1. COLLISION BETWEEN STEAMERS—SIGNALS—MUTUAL FAULT.
   On a dark night, a steamboat coming with an ebb tide down East river, having rounded Hallett's point, intending to go down the channel westerly of Blackwell's Island, and a tug with a car float alongside coming up the easterly channel, intending as she cleared the island to cross to the New York shore and go into the Harlem river, each mistook the intention of the other, and the steamboat and car float collided just above the island. No signals were given, except a single blast by the steamboat just before the collision. Held, that the mutual misunderstanding which caused the collision would not have happened had the vessels given the signals required by the inspectors' rules, and both steamboat and tug were therefore in fault. 55 Fed. 98, affirmed.

2. ADMIRALTY JURISDICTION—DAMAGES FOR LOSS OF LIFE—STATE STATUTE.
   Under a state statute giving the administrator of a person killed by negligence of another a right to damages therefor for the benefit of the next of kin, a libel in personam may be maintained for such damages for death caused by a negligent collision on navigable waters within the state. 55 Fed. 98, affirmed.

3. MASTER AND SERVANT—NEGLIGENCE—VICE PRINCIPAL OR FELLOW SERVANT.
   The master of a steamboat, while in command and directing her movements, is a vice principal of the owner, and not a fellow servant of the engineer, so as to prevent recovery of damages from the owner for the death of the engineer by a collision due in part to the master's negligence. Railway Co. v. Ross, 5 Sup. Ct. 184, 112 U. S. 394, followed. 55 Fed. 98, reversed on this point.

Appeal from the District Court of the United States for the Southern District of New York.

These were two libels, one in personam, by Mary McCullough, as administratrix of Patrick McCullough, deceased, against the New York & Norwalk Steamboat Company, owner of the steamboat City of Norwalk, and the New York, New Haven & Hartford Railroad Company, owner of the steamtug Transfer No. 4 and of Car float No. 16, for damages for the death of said Patrick McCullough by a collision between the steamboat and the car float while in tow of the tug; the other a libel in rem, by the steamboat company

against the tug and car float, for damages to the steamboat by the same collision. The district court found both steamboat and tug in fault, and divided the damages to the steamboat between them, and awarded half damages for the death of McCullough against the railroad company, only, as owner of the tug. The administratrix and the railroad company appealed.

Josiah A. Hyland, for appellant McCullough.

Wheeler H. Peckham, for appellant New York, N. H. & H. R. Co.

Frank D. Sturges, for appellee New York & N. Steamboat Co.

Before WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge. About 3:30 a. m. of March 30, 1893, the City of Norwalk, a steamboat belonging to the New York & Norwalk Steamboat Company, came into collision with car float No. 16, in tow of the tug Transfer No. 4, both belonging to the New York, New Haven & Hartford Railroad Company in the East river, just above Blackwell's Island. The Norwalk sustained damages, and Patrick McCullough, her engineer, lost his life. The owners of the Norwalk libeled the tug and car float. The district judge held both tug and steamboat in fault, and divided the damages. From such decree the railroad company appealed. 55 Fed. 98. McCullough's administratrix sued the owners of both boats, alleging a joint wrong. The court below found both boats in fault, and the deceased free from contributory negligence; it assessed the damages at the statutory amount ($5,000), and condemned the owners of the tug to pay one-half, absolving the owners of the City of Norwalk from payment, on the ground that the intestate was an employe, and could not recover for negligence of a fellow servant. The railroad company and the administratrix (libelant) both appealed.

The case between the owners of the two boats may be first considered. At the time of the collision the weather was fair; the night starlight, but dark; the tide was ebb, and the current about four knots. The City of Norwalk came down the river at a speed of about 8 knots (making about 12 by land), and rounded Hallett's point, where there is a sharp bend. She was bound for New York, and from Hallett's point could have proceeded either down the westerly channel, between Blackwell's Island and the New York shore, or down the easterly channel, between that island and the Long Island shore. It was her intention to pursue the former course, which was her usual one, although sometimes, when she had freight for points on the east shore, she took the easterly channel. The tug, with the car float lashed to her starboard side, came slowly against the tide, through the channel to the east of Blackwell's Island, bound for the New Haven docks in the Harlem river. From the island she might either have proceeded in an eddy along the Astoria shore, passing between Hallett's point and Flood Rock, and thence northerly of Flood Rock and Mill Rock, or, as she cleared the island, she might have struck across to the New York shore, keeping to the southerly of the two rocks above mentioned, and so

on, between Mill Rock and the New York shore, into Harlem river. Sometimes she took one of these courses, sometimes the other, it being her intention on the night of the collision to take the latter. All lights were properly set and burning.    The story of the City of Norwalk is as follows:    Her master was at the wheel; the mate in the pilot house on lookout.    She rounded Hallett's point on a course to pass within 100 feet of Flood Rock on its south side, and, when about "on the upper end of Flood Rock," saw the red light and range lights on the tug and the bow light of the float bearing on the steamboat's port bow, and about a quarter of a mile distant. The master of the City of Norwalk supposed the tug was on a course towards the eddy on the Astoria shore, to take advantage of that eddy.    The steamboat proceeded on at the same speed in order to keep her under control, and when past Flood Rock, and heading to go down the channel between Blackwell's Island and New York, the green light of the tug suddenly came into view, she having starboarded her helm; and the tide, as she swung to port, shot her rapidly towards the steamboat.    Immediately upon the green light of the tug coming into view, a signal of one whistle was given by the steamboat, her helm was put hard a-port, and she continued on in the hope of crossing the tug's bow, it being impossible to stop her, and thus prevent a collision.    No answer was given to this signal by the tug, and she also apparently continued on, so that the vessels came together with great force, the port corner of the float (which projected beyond the tug) striking the port side of the steamboat a little aft her stem.    The claim of the Transfer is as follows:    When near Gibb's point, which is in the channel east of Blackwell's Island, she starboarded her helm so as to stem the true tide and pass close to the point of the island, within 100 feet of the shore, and from there to the Harlem river; that when near Blackwell's Island light she for the first time saw the Norwalk near Flood Rock, showing a green light; that the boats were then green to green, and that suddenly, when almost abreast of the Transfer to the east, the Norwalk showed her red light, and tried to cross the bow of the Transfer; hence, the collision.    These stories are direct contradictions. If the Norwalk navigated as she says she did, it was impossible for her to show her green light to the tug, and, if the tug's story is correct, it must have been her green, and not her red, light, which she showed to the steamboat.    Without undertaking to determine the precise movements of the vessels, and their successive and respective positions in the channel, the district judge held both in fault for failure to give the signals required by the inspectors' rules.  In the conclusion thus reached by the district judge we concur.

Manifestly this collision happened because the master of each vessel inferred from such indications as he noted that the other was about to take a particular one of two known courses, when, in fact, that other's intention was to take the other course.    It is the very object of the law providing for the giving of signals to increase the number of indications which may be noted and reasoned from, thus promoting the accuracy of the inferences drawn from them. That both vessels failed to conform to the inspectors' rules is hardly

disputed. Counsel for the tug admits that, "in not sounding the whistle when he first discovered the Norwalk, Capt. Harper omitted a precaution enjoined upon him by the statute," that it was "a technical violation of the rule," though he seeks to excuse it, either as not contributing to the catastrophe or as overshadowed by some subsequent fault of the other vessel, which was, as he contends, the more immediate cause. That the Norwalk flatly violated rule 5, requiring a steamer nearing a short bend or curve in the channel to give a prescribed signal, is indisputable; she gave no signal whatever before rounding Hallett's point, and none after, save only the single blast in the jaws of the collision. When violation by each vessel of an express rule of navigation is plainly apparent, each must be held to blame, unless it is clearly shown that the technical fault did not contribute to the collision. The evidence, however, does not warrant any such excuse. The Transfer had no stationed lookout, the master acting as pilot and lookout both. He did not see the Norwalk's lights, when they first came within his field of vision from around Hallett's point, nor until she had got across to Flood Rock. How can it be said that if the Norwalk had blown the alarm whistle, which the law required of her, before she rounded the bend, he would not have heard it, or that, hearing it, he would not have regulated the tug's movements so as to avoid collision, especially if, immediately upon sighting the Transfer, the Norwalk had blown the single blast which would have indicated her intention to pass to the starboard? The master and mate of the Norwalk failed to see the Transfer as soon as she came within their field of vision. If the latter had sounded two blasts, as the rule required her to, indicating her intention to go to port, how can it be said that such notice of her presence and intended course would not have prevented the misunderstanding on the part of the Norwalk which brought that vessel across the Transfer's bow? We agree, therefore, with the district judge in the conclusion that the mutual misunderstanding which caused the collision would not have happened had the vessels given the signals required by the inspectors' rules. Both were therefore in fault.

The case of the administratrix against the owners of the two vessels presents some further questions. It is contended that a libel in personam for damages for loss of life under the state statute cannot be maintained in admiralty. This objection has been most exhaustively discussed by the learned district judge, and all the authorities bearing upon it stated and analyzed. There is nothing to add to his disposition of the question in the subdivision of his opinion which deals with it, except to say that we fully concur therein. The damages were the result of a tort committed on navigable waters of the United States,—the tort by place and circumstance a maritime one; the locality was within the waters of a state which by its statute gave to the administrator of the person killed a right to receive, for the benefit of the next of kin, a sum of money by way of damages for the death of the intestate. The supreme court has expressly held that such statutes are valid, even when the tort was committed on navigable waters, in the absence of any regulation

of the subject by congress. Steamboat Co. v. Chase, 16 Wall. 522; Sherlock v. Alling, 93 U. S. 99. There is no question here of an attempt to create a maritime lien by state law; that law simply gives in certain cases a legal right to damages for a tort, which survives the person injured, and passes as do other rights of property, to the legal successor to his estate. The admiralty courts, before the passage of the statute, exercised jurisdiction over precisely such claims for damages, when brought in his lifetime by the person injured, and there seems no sound reason why they should not exercise like jurisdiction when the tort is committed in a locality where the municipal law preserves the right to redress beyond the life of the injured person. It is not logically an enlargement of jurisdiction so as to cover a general subject not cognizable before, but a mere increase of the varieties of cases embraced within that subject.

The only question left for consideration is whether the fact that the collision which caused the damage was due in part to the negligence of the master of the City of Norwalk will prevent any recovery by the administratrix against the owner of that vessel, on the theory that the master and the deceased were fellow servants. On this point we disagree with the district judge, being of the opinion that the case is entirely within the principle laid down in Railway Co. v. Ross, 112 U. S. 394, 5 Sup. Ct. 184. There the conductor of a railway train was held not to be a fellow servant with the engineer, because the conductor had its entire control and management, commanded its movements, directed when it should start, at what stations it should stop, at what speed it should run, and exercised control over the persons employed upon it. We are unable to distinguish such a conductor from the master of a ship, who, certainly while he is on deck and in command, directs its movements, regulates its speed, and controls the ship's company. If the conductor represents the owner, as a vice principal, most certainly the master does. The distinction drawn in Quinn v. Lighterage Co., 23 Fed. 363, is not applicable, for the master was in charge of the steamer and acting as master. He was exercising command, not simply assisting in the discharge of some minor duty entirely outside of a master's functions; and, while thus in command, directing the steamer's movements, he so negligently directed them as to cause collision.

The decree of the district court in the libel of the steamboat company against the Transfer is affirmed, with interest and costs. In the other case the decree in favor of the libelant against the railway company is affirmed, with interest; the decree dismissing the libel against the Norwalk Steamboat Company is reversed, and cause remanded, with instructions to decree against that company for half the statutory damages, with interest, and costs of both courts.