## KILLIEN v. HYDE et al.

(District Court, S. D. New York. August 25, 1894.)

1. COLLISION—FERRYBOAT AND TUG—CONTRIBUTORY NEGLIGENCE.
    A fireman of a tug which, because of a collision, had so careened as to be in apparent danger of capsizing, who jumps into the water under the belief that the boat is about to upset, is not guilty of negligence.

2. SAME—OVERTAKING VESSEL—MID RIVER—STATE STATUTES.
    A ferryboat and tug were going down the East river. The tide was strong flood. The ferryboat was to port of the tug, and about 200 feet astern, when both stopped to allow a crossing steamer to pass. When they went ahead the ferryboat sheered out towards the middle of the river, but soon placed her wheel to port, to turn her head down the river, which brought her course to starboard. When the tug reached Corlear's Hook, she felt the force of the flood tide, and was turned to port, towards the ferryboat, which was then about 100 feet to port of her, and shortly after the collision occurred, about 300 feet from the New York shore. *Held,* that both vessels were at fault,—the tug, for not sufficiently porting her wheel when approaching the hook so as to counteract the cross-tidal current; and the ferryboat, because she did not keep as much away from the tug as reasonable prudence demanded, she being the overtaking boat, and nothing preventing her going in midstream, as required by statute.

3. SHIPPING—INJURY TO SEAMAN—NEGLIGENCE—FELLOW-SERVANTS.
    Where the owner of a tug, who is also captain and pilot, and in charge thereof, temporarily places at the wheel, when the boat is in a difficult situation, an unlicensed person, not of the experience required, and by reason of his want of skill a collision occurs, causing the death of a fireman of the tug, the owner is liable.

Libel by Mary Killien, administratrix of Martin Killien, against the owners of two vessels, alleging negligent collision by which intestate lost his life.

E. N. & T. M. Taft, for libelant.
Alexander & Ash, for respondent Hyde.
Wm. J. Kelly, for Long Island R. Co

BROWN, District Judge. The above libel was filed by Mary Killien, as administratrix of Martin Killien, her husband, to recover damages under the statute of this state, for the death of the deceased, a fireman on the tugboat William H. Walker, on the afternoon of June 13, 1893, through an alleged negligent collision between the Walker, owned by the respondent Hyde, and the ferry-

boat Garden City, owned by the respondent, the Long Island Railroad Company.

The collision occurred on the East river, from 200 to 300 feet off the New York docks, about opposite the marble yard, just below the turn of Corlear's Hook. The weather was clear and pleasant, the tide, strong flood. Both boats were going down river; the Garden City, on one of her regular trips from Hunter's Point to James' slip; the Walker, going down under one bell, near the docks, looking for a job. About 200 feet in front of them was the transfer tug No. 5, also going down. All three boats had come to a stop just above the Grand street ferry for two ferryboats of that line on the New York side, one coming out of that ferry, and another going in. At that time the Garden City was a little outside of the Walker, and about 200 feet astern of her.

'As soon as the inward-bound ferryboat at the Grand street ferry would permit them to pass, the three boats started ahead, the Garden City sheering at first somewhat outwards into the river. Soon afterwards she put her wheel to port, to turn her head down river. This brought her course more to starboard while rounding the hook, and gave the appearance of a sheer towards the Walker, as in a certain sense it was. The Walker at the same time on passing from the eddy, as I find, and striking the force of the true flood tide, which there sets strongly across towards the Brooklyn shore, was turned by the tide to port towards the Garden City, which, going faster, was overtaking and passing her on the Walker's port side. The Garden City was in fact passing so near, viz. from 40 to 100 feet, that after their approach to each other sideways was observed, before either could do anything effectual to prevent it, they came in collision, the port bow of the Walker striking the Garden City about 40 feet forward of her paddle box, and running under her guard, where she stuck fast. The blow itself was not violent, the Garden City having reversed, and the Walker having stopped her engines just before collision; but as the Walker swung round with the tide against and under the other's guard, she took and kept such a strong list to starboard, that observers thought she was going to roll over. Just at that time the engineer, who had been at supper in the kitchen, and heard the bell to stop a moment before collision, in trying to run around the house from port to starboard, so as to reach the engine room and attend to the engine himself, was unable to keep his footing, through the strong list to starboard, as above stated, so that he could not help running off the deck into the water. A few moments afterwards, the deceased, who during the engineer's absence at supper, had been temporarily doing the engineer's duties at the engine, was also seen to run off the deck on the starboard side, a little forward of the engineer. The engineer after some ten or fifteen minutes was rescued; but the fireman was drowned. He was a fair swimmer, but seemed to have incurred some disability. He was 30 or 40 feet away from the engineer in the water, and they exchanged a few words; the last heard from the fireman being, that he could not hold out much longer. Soon after he sank.

1. There is no trustworthy evidence to indicate with certainty whether the fireman jumped off the boat voluntarily, or whether, like the engineer, in coming suddenly and quickly upon the sloping deck, he was unable to hold his footing, and was forced overboard. That he went off after the Walker had careened greatly, is clear from the fact that his position in the water was to the southward of the engineer, so that he must have gone over after the engineer. There seems to me small probability that he went overboard voluntarily; and if he did, it must have been done presumably from fright at the position and list of the Walker when he reached the open deck, and from apprehension of immediate capsizing; and even on that hypothesis, I could not hold him legally chargeable with negligence, or legal fault, for such an act done when apparently in extremis. The City of Norwalk, 55 Fed. 102, where the court says:

"The attempt of the deceased to jump to the float should not be treated as a legal fault, though a mistake and an error of judgment. He had doubtless seen one or both of his shipmates jump just before. Coming suddenly from the engine room immediately upon the crash of the collision, when a considerable part of the side of the steamer had been carried away, and in the alarm attending such a catastrophe in the night time, there was no time nor opportunity for the exercise of deliberate judgment, and his act should, I think, be treated as errors in extremis are treated, viz. as a mistake made under the apprehension of immediate danger, for which those who wrongfully brought about the situation, and not himself, should be held to blame." Affirmed on this point, 9 C. C. A. 521, 61 Fed. 364.

2. There is considerable conflict in certain parts of the testimony as to the faults causing the collision; but I am satisfied that the collision occurred from several contributing causes which inculpate both vessels. The weight of evidence shows that the collision was in the true tide, and not in the eddy; that the Walker, in passing out of the eddy into the true tide as the Garden City drew abreast of her, swung two or three points to port, towards the line of the ferryboat's course, while the latter was swinging to starboard under the port wheel. The Walker swung to port, because she did not sufficiently port her wheel in time to counteract the effects of the cross-tidal current which she met in rounding the hook. She was going slowly, under one bell; and this made a stronger port wheel necessary than when going at ordinary speed. The deck hand was at the wheel, temporarily taking the place of the master who was the pilot, but who was then at supper in the kitchen; and did not leave the kitchen until a few moments before collision when he saw the Garden City abreast, and said to the engineer, "She is going to plug into us." The deck hand was a young man, not licensed as a pilot, and he was left alone in a position requiring thorough skill, experience, and matured judgment in order to avoid accident in one of the three most dangerous places about New York harbor.

I do not think the witnesses from the Garden City are correct in supposing that the deck hand starboarded his wheel instead of porting it. The cross current, and the necessity of a port wheel to counteract it, were perfectly well known. But the precise amount of porting needful was a question of skilled judgment, depending

as it did upon the various circumstances, of the distance of the Walker from the shore, the speed and the draft of the tug, the time of tide, and correct observation of the line where the true tide was reached. The near presence of the Garden City on the port side made special care as to all these points necessary, in order to avoid the natural set of the tide towards her. The evidence leaves no doubt in my mind that the Walker swung, as I have said, from two to three points to port, through lack of efficient and timely means to prevent it, and thus contributed to the collision. The deck hand, who had the wheel, testified that even at collision the Walker was in the eddy tide; and if he was acting on that supposition at the time, inasmuch as that supposition was clearly wrong, his swing to port was the result of faulty observation of his position. If the master, who was also both owner and pilot, had been at his proper post, at a place of such danger, I think his better observation, experience and skill would have prevented mistake, and the collision would have been avoided.

There was no other pilot aboard; and the master is himself chargeable with negligence for absence from his post at so dangerous a point, and for substituting in his place a person neither legally certified as qualified therefor, nor sufficiently proved to possess the requisite experience and skill to be able to act alone as sole pilot in so difficult and complicated a position. Much of the master's testimony I am unable to accept as correct, both from his strong interest, and from its inconsistency with the testimony of others, and with his own testimony before the inspectors. He came on deck forward just before collision; but too late, as I find, to be of any service.

3. The evidence is equally conclusive that the Garden City did not keep away from the Walker as much as reasonable prudence demanded, in that peculiar locality. The Garden City was the overtaking vessel; she was bound to keep out of the way of the Walker; she had the port side of the river open to her; the state statute required her to go as near the middle of the river as possible, and there was nothing to prevent her going in mid-river. On going astern of the Grand street ferryboat, she sheered out somewhat towards mid-river; but instead of continuing on into the middle of the river, as she should have done, she ported her wheel when not a quarter of the way across from the New York shore, and thereby hauled up again towards the Walker, so as to overtake and attempt to pass her within from 40 to 100 feet of her, and just at a time and place when the Walker would strike the cross current of the flood tide, and be likely to be deflected, as often happens, from her proper course, and where in case of any miscalculation, such as happened in this instance, the vessels were sure to be carried dangerously towards each other. This was not a reasonable performance of the duty of an overtaking steamer "to keep out of the way" of the vessel she is overtaking; and the violation of the state statute also is by the result shown to have been material. She was not allowing a reasonable margin for the contingencies of navigation in that peculiar situation, and its well-known peculiar dan-

gers. The Ogemaw, 32 Fed. 919; The Britannia, 153 U. S. 130, 14 Sup. Ct. 795; The Oceanic, 61 Fed. 338, 362. Besides this, there is so much evidence tending to show that under her port wheel, the Garden City more than broke her sheer to port so as to head the tide, and actually came again somewhat to starboard towards the Walker, that I think it probable that this also contributed to the collision; though the Garden City again ported when it was too late to avoid collision; but this element was probably much less than it appeared to be to the Walker, in consequence of the latter's change to port.

4. It is urged that the deceased fireman was a fellow servant of the deck hand by whose negligence the Walker's fault was caused; and that there can, therefore, be no recovery against the owner of the Walker. Had the master and owner not been in any personal fault, I think that result would have followed. The decision of the court of appeals in McCullough v. Steamship Co., 9 C. C. A. 521, 61 Fed. 364, 368, I think, is not applicable here. It is the nature of the duty or service, in the course of which the negligence occurs, and not the person who happens to be performing it, that, as I understand, determines whether the case is to be treated as one of fellow servants, or not. Quinn v. Lighterage Co., 23 Fed. 363; The Queen, 40 Fed. 694, 696, 697; The City of Alexandria, 17 Fed. 392; The City of Norwalk, 55 Fed. 98; The Victoria, 13 Fed. 43; The Harold, 21 Fed. 428. Here the owner, who was also master, was himself negligent, as I have above said, for absence from his post in a difficult situation, and for practically substituting in his place as pilot, temporarily, an unlicensed person not of the proved experience and skill required in such a situation. That was a fault, not merely of one of the details of navigation, but in the general management and control, which makes the owner liable. Railway Co. v. Ross, 112 U. S. 394, 5 Sup. Ct. 184; Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914.

The statutory limit of $5,000 is not in excess, I think, of the pecuniary loss sustained by the family of the deceased; and a decree for that sum and costs may, therefore, be taken against both defendants in the usual form.