## THE BRITISH QUEEN.

### (District Court, S. D. New York. October 8. 1898.)

COLLISION—SIGNALS MISUNDERSTOOD—DELAY IN BACKING—INSPECTORS' RULE 3.
The steamship Alvena outward bound through the Swash and Gedney channels, and the British Queen inward bound through the Gedney and Main channels, came in collision near the junction of the Swash and Main channels; this was caused, as found upon very conflicting evidence, by a misunderstanding of the signals given and heard, in consequence of which each vessel was navigated contrary to what was expected by the other; *held* upon a review of all the evidence and circumstances, that the failure by each vessel to navigate as expected by the other and in accordance with the signal as understood, ought to have been seen by each steamer and recognized before the danger became imminent, and a considerable time before either steamer reversed; and that each vessel was in fault, therefore, for not reversing until they had come within one-fourth of a mile of each other, instead of when one-half a mile apart, as required by rule 3 of the supervising inspectors, which requires in such circumstances that vessels when within one-half a mile of each other shall immediately reduce their speed to bare steerage way.

Butler, Notman, Joline & Mynderse, for Mannheim Ins. Co.
Carter & Ledyard and Walter F. Taylor, for Atlantic Ins. Co.
Cowen, Wing, Putnam & Burlingham, for the British Queen.

BROWN, District Judge. The above libels were filed by the insurers of cargo on board the steamship Alvena, to recover for the nearly total loss of her cargo of the alleged value of about $100,000, and which the libelants insured to the amount of from $50,000 to $60,000, resulting from a collision with the steamship British Queen at about 2:15 p. m. of January 19, 1897, in the lower bay of New York. The British Queen, about 400 feet long and drawing 19½ feet aft, was inward bound through Gedney channel. Her full speed was from 11½ to 12 knots. The Alvena, 275 feet long and drawing 19 or 20 feet, was outward bound by way of the Swash channel and intended to go through Gedney. Her full speed was 11 knots. The tide was the last of the ebb, the wind fresh from the N. W., the weather clear, and neither vessel was materially obstructed by any other. The collision occurred near the junction of the axis of the Swash channel with that of the Main ship channel, about 1,500 or 1,600 yards to the westward of buoys 7 and 8 at the westerly end of Gedney channel. The Queen's stem struck the Alvena's port quarter at about right angles 30 feet forward of the Alvena's stern, broke a hole in her four feet deep, and disabled

her steering gear. The Queen also sustained some damage. After separating from the Queen the Alvena took in water rapidly; and her stern having been carried to the westward by the force of the collision, her engines were put ahead, and she was run to the eastward upon Muscle shoals.

The primary cause of the collision I find to have been a misunderstanding as to the signals given and received, the Alvena having navigated in accordance with a signal of one whistle, which she understood to have been given by the Queen and which she answered with one blast; while the Queen's navigation was in accordance with a signal of two blasts, which the Queen gave to the Alvena and understood to be answered by two. But this misunderstanding of signals when the vessels were about 1¼ miles apart, is not a sufficient excuse for the collision that followed. Its second and more immediate cause was the failure of each vessel to repeat its signal in due time, and especially the disobedience of rule 3 of the supervising inspectors, which required upon a misunderstanding by each, when the vessels had approached within a half a mile of each other, that both should be immediately slowed to a speed barely sufficient for steerage way. For it must have been clearly manifest to each vessel when they were at least a half a mile apart, that there was danger of collision, and that the course and intention of the other were not understood, either through a misunderstanding of signals, or because the other vessel was not navigating in accordance with the signals as understood; and in this regard both vessels seem to me equally culpable.

The importance of the case makes desirable a somewhat detailed statement of the facts and circumstances derived from the voluminous evidence leading to the above conclusions.

1. The Queen, according to her officers' testimony, was intending after passing through Gedney channel to take the Bay Side cut and Main ship channel; the Bay Side cut being that part of the Main ship channel which extends about 1,500 or 1,600 yards W. by S. from the westerly end of Gedney channel to the axis of the Swash channel, with a change of course of 2¾ points to the southward from the course in Gedney. The Swash channel, nearly 4 miles long, runs N. W. ⅜ N. A vessel coming in by way of Gedney channel and designing to go up the Swash, would naturally make a point less change to the southward than the course of the Bay Side cut on leaving Gedney channel at buoys E. 7 and 8, and take a little more direct course along the southerly side of the Perch and Square buoy, or the Cage buoy as it is called by the pilots, which is from 800 to 900 yards from the Gedney buoys, and thence rounding to the northward would reach the middle of the Swash channel at a point at least half a mile to the N. W. of its junction with the Main channel; and conversely, an outward bound vessel, like the Alvena, going out through the Swash channel would naturally take this somewhat shorter course to Gedney if there were no obstructions in the way.

2. When the Alvena had reached the tail of the Romer, not far from abreast of buoy S. 2 and being then from three-fourths to

seven-eighths of a mile to the northwest of the junction of the Swash and Main channels, the Queen was seen at the end of Gedney rounding into the Bay Side cut. She was a little further off than the witnesses estimate, being then about a mile and a quarter distant. She had been seen from the Alvena long before that, but no signal up to that time had been heard from her. If the Queen was intending to go up the Swash, each would properly keep to the right with a signal of one blast of the whistle, and they would pass port to port; if the Queen intended to take the Main ship channel, she would keep to the left, more to the southward, and the vessels would properly pass starboard to starboard with a signal of two blasts. The Queen being seen to be high out of the water and presumably able to take either channel, the Alvena, in order to ascertain her intentions, gave her a signal of two blasts. Many witnesses from the Alvena, two from the Queen, and two other disinterested witnesses say that the Queen answered with one blast to which the Alvena at once responded with one blast. The officers of the Queen who were in charge of her navigation and many others say that the Queen blew no signal of one blast, but signaled with two blasts only. Her officers further testify that prior to the Alvena's signal they gave the Alvena a signal of two blasts while turning into Bay Side cut, to which the Alvena gave an answer of two blasts; that at 2:08 while in Gedney channel, the Queen's engines had been slowed to "half speed" (equal to about 8 knots) to give a schooner in tow of the tug Emperor, which was going from the Swash channel into the South channel, time to cross the Bay Side cut ahead of the Queen; that at 2:10 by the watch, shortly after getting two blasts from the Alvena in reply to the Queen's first signal of two blasts, the Queen's engines were put ahead full speed, after starboarding as required; that soon afterwards, observing that the Alvena was not starboarding in accordance with her two blasts, the Queen repeated her signal of two whistles, to which the Alvena replied with two blasts; but that while the Alvena was giving this reply her masts were seen to be opening more to the westward, showing that she was in fact porting, whereupon the Queen's engines were at once reversed at 2:11, as were the Alvena's at about the same time, when the vessels were from 100 to 500 yards distant, resulting in collision at 2:15 as above stated. The officers of the Alvena deny that after her reply of one blast as above stated, any signal was given by her except the three blasts on reversing.

3. I find no way of completely harmonizing this testimony as to the signals. For the libelants it is urged that the first signal given by the Queen to the Alvena was in fact a signal of one blast only, as the Alvena understood it to be; and that the Queen intended, when she came out of Gedney channel, to go up the Swash channel astern of the Alvena, but was thwarted in this expectation by difficulties in turning the Queen to the right, through her flat bottom, high bows, the strong N. W. wind and the ebb tide. No doubt each of the circumstances just named existed, and would make the Queen's swing to starboard somewhat slower than usual, if

attempted at that time; but these circumstances, as against the testimony of her officers and the probabilities of the case, afford too slender a foundation for adjudging the officers of the Queen guilty of deliberate fabrication in their testimony as regard their first signal and their subsequent maneuvering, which the libelants' contention would require. Many witnesses, and several of them disinterested, testify that the Queen's signal was of two blasts. Had it been of one blast only, with intent to go up the Swash channel, the Queen would have kept along near the Cage buoy, turning one point less to the southward than the course of the Bay Side cut, which she in fact took; the evidence shows that to be the ordinary course; and the Queen could not possibly have had any difficulty in taking that course and going near the Cage buoy, if desired, since she had kept her course up the Gedney channel, which was two points more to the northward. The testimony, moreover, is that her steering qualities were good. Had she intended and attempted to go up the Swash channel, it is not credible that she should not have made some show of it to the Alvena, by at least going in the vicinity of the Cage buoy; whereas the testimony of the Alvena's officers, who were expecting and watching for this very thing, and the testimony from the Queen is, that she went straight down on the Bay Side course (going as the pilot says a little on its southerly side) the center of which, according to the chart, runs at least 300 yards to the southward of that buoy. It is not credible that the Queen would have thus gone out of her way to port had she given a signal of one blast only, or if she had intended to go up the Swash channel. Her pilot and master testify that they had no such intention, but intended to take the Main channel, as they did; and with that intention, it is not credible that they gave a signal of one blast only, signifying the opposite intent.

4. On the other hand, it is equally incredible that the Alvena should have given up her most direct course to Gedney channel and ported, and thus have gone out of her own way, in order to give the Queen the straight and proper course to the Swash channel, as she did, had she not understood the Queen's answering signal to be of one blast, signifying her intention to go up the Swash channel; and upon this understanding, and not otherwise, would she have given her one blast in reply, to which so many of the Alvena's witnesses have testified. This last reply of the Alvena evidently was not heard or noticed by the Queen's pilot or master; partly, perhaps, because the two previous signals being in accord, no further signal from the Alvena at that time was expected or looked for. Several of the Queen's witnesses, however, testify to hearing a one blast signal from the Alvena, though this is stated as her reply to the second signal of two blasts from the Queen, just before reversing; but as the Alvena gave no such reply, it is probably misplaced by these witnesses.

5. I find therefore, that the first signal of the Queen was of two blasts; that the Queen navigated in accordance therewith; and consequently that she is not in fault, as charged, for navigating contrary to her own signal. It is not necessary to decide whether

she is to blame for not noticing or answering the Alvena's signal of one blast given immediately afterwards, as I find the Queen to blame on other grounds.

6. There has been much contention as to which vessel gave the first signal to the other. I consider that question immaterial here, because neither vessel was in fact designing to cross the course of the other. The intended course of each being to the left of the other's course without crossing it, it was competent and right for either to give the signal of two whistles, in accordance with her own intent and convenience, as well as to ascertain the intent of the other as between two possible courses. Each contends that her own signal of two blasts was the first, and that the other's was an answer. As the vessels were at least a mile and a quarter apart, requiring an interval of from six to seven seconds for the sound of whistles to pass from one vessel to the other, if each vessel gave her signal independently of the other, and at about the same time, each would naturally interpret the other's signal, heard several seconds later, as an answer to her own. Some confirmation of this explanation is found in the testimony of the Queen's pilot, that the Alvena's signal of two blasts was heard "5 or 6 seconds" after his own signal, and the pilot of the Alvena says that the Queen's answer was heard only a few seconds after his own. At that distance, moreover, the Queen's two blasts, if given in quick succession, being heard against a strong puffy N. W. wind, might not have been distinguished as two, but heard as one; or one of the two might not have been heard at all.

7. That the first signals of these vessels were given at about the same time, is evident from the testimony of both that they were given while the Queen was rounding out of Gedney channel into the Bay Side cut. That this is correct is further confirmed by the testimony that at the time the signals were exchanged the Alvena bore 2 or 3 points off the Queen's starboard bow. As the Alvena was then at the tail of the Romer not far from abreast of buoy S. 2 and to the westward of it, she would have been nearly straight ahead of the Queen had the latter not been already swinging out of Gedney channel and into Bay Side cut. This bearing of the Alvena, to which the master of the Queen testifies, also proves that the Queen at the time of her first signal was nearly rounded upon the Bay Side course, as her pilot testifies.

8. The testimony of the Queen as to her second signal of two blasts and the Alvena's immediate reply with two, though contradicted by the Alvena, is not material; because by the Queen's own account this signal had no influence on the navigation of either vessel, and was too late to be of any use. While the Alvena was answering she was seen to be porting, and the Queen at once stopped and reversed and gave danger signals. The vessels were then not over 400 or 500 yards apart, and collision soon followed. The Alvena gave danger signals, as her officers say, before the Queen's were given; and it is not credible that the Alvena should have given a two-blast signal indicating either that she was starboarding, or would attempt to starboard her wheel and go to port

while she was swinging to starboard under a port wheel, and was so near to the Queen, and bearing but two points off her starboard bow.

9. Though the result of the first signals was thus a dangerous misunderstanding, this was no justification, as I have said, of the collision that followed. There was still abundant time and space for each to observe and to correct the common error. The rules as to signals are designed to supply additional means of safety by enabling vessels to come to an early understanding of each other's intent; not to dispense with subsequent care and vigilance; and it is against common sense to say that a misunderstanding of signals when vessels are a mile and a quarter apart, and each vessel thereafter navigates in accordance with her actual signal but contrary to the other's understanding of it, could not by the exercise of the most ordinary care and skill, in clear weather and with no obstructions, be seasonably observed and corrected. The evidence as to the distance traversed after the first signals, and the courses and bearings of the vessels, leave no doubt that both vessels had abundant opportunity to correct their misunderstanding, and that the proximate cause of the collision was their failure to do so, and neglecting to reverse much earlier than either reversed, as required by rule 3 of the supervising inspectors, when the misunderstanding became plainly apparent and ought to have been noticed and corrected. The rule provides that:

"If either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts upon the steam whistle, and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerage way, until the proper signals are given, answered or understood, or until the vessels shall have passed each other."

For vessels of such size, when only half a mile apart, "immediate slowing to bare steerage way" requires immediate reversal.

10. Had this rule been complied with by either vessel, by giving the danger signals and reversing when within even a third of a mile of each other, there is no question that the collision would have been avoided. But this was not done by either. That the vessels on reversing were certainly quite near each other, appears clearly from all the testimony. To the witness Tower, who was on board the schooner, they appeared, when the danger signals were given, about a length apart; Van Pelt, the Queen's pilot, says they were then 200 or 300 feet apart; her master, Capt. Smith, says "pretty close, 500 or 600 feet"; Van Ex says 2 lengths; Capt. Dow of the Alvena, in her protest filed the next day, said one-eighth of a mile; at the trial, he says one-fourth of a mile apart. Devere, the pilot, gives different estimates of 200, 300 and 400 yards. This testimony fully justifies and confirms the computation stated below, (based upon the elements of the Queen's navigation as given by the master), that when she reversed the Queen was not over 300 yards from the place of collision, nor over 400 or 500 yards from the Alvena.

11. The weight of evidence as to the place of collision fixes it near the junction of the axes of the Main and Swash channels or to the westward of it, which is 1,500 or 1,600 yards from the place of first signaling; so that the Queen after her first signal and before reversing, must have traversed more than two-thirds of a statute mile, and therefore have had abundant opportunity to discover and correct the misunderstanding of signals, and to observe seasonably the rule above cited. The place of collision is so important in this point of view that I add some observations on the evidence regarding it.

(a) The bulk of the direct testimony places the collision near the intersection of the axes of the Swash and Main channels, which is 1,500 yards W. by S. from the westerly Gedney buoys. The Queen's pilot places the collision near the Perch and Square (Cage) buoy, saying at one time that the collision was a little over a ship's length to the west of that buoy; at another time, that the order to reverse was given at the same place, which would be about 1,100 yards from the westerly end of Gedney. But this is but slightly supported and it is opposed to the weight of testimony and all the probabilities of the case.

(b) The Alvena, as the testimony shows, came down about in the middle of the Swash channel, and after the signals, as both sides testify, she did not starboard at all, but ported; so that she must have reached the place of collision while a little west of the middle of the Swash channel; and as the Queen under her starboard wheel went to the port (southerly) side of the Bay Side cut, as the pilot testifies, in order to give the starboard side of that channel to the Alvena, and this being probably offset by the Queen's swing to starboard while reversing, it follows that the collision must have been a little to the westward of the junction of the two axes.

(c) Considering the circumstances affecting the speed of each vessel, that the Alvena put her engines at "slow" on getting, as she supposed, a signal of one blast from the Queen, and that the Queen was put at half speed about a minute before her first signal and at full speed soon after, it is probable that the average speed of the two vessels was about the same during the interval between their first signals and the collision, the Alvena going faster at first but slower than the Queen afterwards, or at least that the Alvena made but little if any more headway than the Queen; and if so, no place can be assigned for the collision where the distance traversed by each would be about the same from their respective places when they signaled, except near or to the westward of the intersection of the two channels, assuming that the Queen, as her pilot testifies, went to the southerly side of the axis of the Bay Side cut.

(d) If the collision had occurred only a length or a length and a half westward of the Cage buoy, as the Queen's pilot states, the Alvena must have traveled after the first signals about 1,900 yards while the Queen was going about 1,000, which was impossible for the Alvena; and she must also have starboarded about two points at the first signal and kept that course; which is plainly contrary to the evidence on both sides.

89 F.—64

(e) For the same reasons, the entry in the Queen's bridge book that she reversed at 2:11 is plainly erroneous. This was but about two minutes after her first signal and the Queen having been previously at half speed, would not have traveled over 600 yards in that interval; so that at 2:11 she would not have reached the Cage buoy; and by no possibility could the Alvena in that short interval have approached so near to her as all the testimony shows that she was at the time of reversal, the highest estimate being one-fourth of a mile; because in order to have come within that distance of the Queen, while the Queen was still east of the Cage buoy, would have required of the Alvena a speed of 20 knots, nearly double her capacity.

12. The entry in the Queen's bridge book of 2:11 as the time of reversal, and the testimony in connection with it, have so important a bearing on the Queen's responsibility for the collision, that I should state the many considerations that lead me to discredit this entry. (1) It is wholly incompatible with most of the other testimony and with other circumstances of most persuasive force. At 2:11 the Alvena was more than two-thirds of a mile away from the Queen, and the two vessels could not possibly have reached each other had the Queen reversed at 2:11. (2) It is incompatible with the place of collision, as otherwise proved; because it allows the Queen but two minutes advance between her first signal and reversing, and she could not possibly have reached the place of collision in that way. I think 2:15 as the time of collision is correct; because it harmonizes with the place of collision, the proved rates of speed of the two vessels, the distance traversed and the time necessary to traverse it. (3) The Queen could not have reversed more than two minutes before collision; if she had done so she would have been moving backwards in the water before collision. Being light, with high bows, and going against a strong N. W. wind, she would have stopped dead from full speed ahead in her minimum time of three minutes. (See master's testimony, pages 462–3). But she was not going at full speed at 2:11, nor more than eight or nine knots; nor did she get stopped at collision. The cut of four feet into the Alvena, and the swinging of her stern to the westward several points from the force of the blow, show that the Queen at collision was going ahead through the water at the rate of two or three knots. As she backed at her utmost capacity, at the rate of 80 revolutions, and as she would come to a stop from full speed ahead under such circumstances in about 3 minutes, it is evident that she could not have occupied over 2 minutes in reducing her speed from about 9 knots to 2 or 3, nor have advanced in that time over 400 or 500 yards. The Normandie, 43 Fed. 159–162, note. (4) The entry itself in the bridge book is of a dubious character. The character of the writing suggests that the original entry was only "2:11 stop"; following this comes "∧ full astern for steamer." The words "full astern" are written quite unlike the word "stop"; the latter is written rudely, as if hurried; the former in a slow, careful hand as if entered subsequently and at leisure. The word "astern" is written in full, while elsewhere

in the book that word is abbreviated. The sign Λ separates these words from "stop"; and that sign does not elsewhere appear in the book. It is called "and" in the stenographer's notes, but the sign which may be for "and" in other parts of the book is quite unlike this sign. The second officer copied into the scrap log the other entries in the bridge book pertaining to the collision; but he says he omitted the entry of 2:11 and also the preceding entry "2:10 full ahd," although he copied what was immediately before and after those entries. He had previously testified that all that was in the bridge book was copied into the scrap log, that such was the custom, and he gives no reason for omitting these two entries. (6) The master some time afterwards interlined new matter in the bridge book, and also in the scrap log; and in the insertions in the scrap log he did not copy from the bridge book, as the word "stop" after "2:11" in the bridge book is omitted in the scrap log. The master there wrote "2:11 full astern for steamer." (7) This insertion in the scrap log is written over a very evident erasure, which is unexplained; and both officers deny any knowledge of anything previously written there. (8) From the second officer's statement at page 406, it is doubtful whether anything was written in the bridge book at the moment as to those matters, except the hour and minute alone, the rest not being "written up," he says, until afterwards. It is uncertain whether he refers to the single entry of 2:15, or to the other entries also connected with the collision. An entry attended by so many dubious circumstances cannot outweigh so much other persuasive evidence to the contrary.

13. My conclusion, therefore, is that the collsion happened at about 2:15 by the Queen's time, near the center of the Main channel and a little only to the westward of the axis of the Swash channel; that the Queen reversed at about 2:13 when not over 300 yards from the place of collision, and less than a quarter of a mile from the Alvena; and that the Queen had traversed about 1,100 or 1,200 yards, or two-thirds of a statute mile, in the previous interval of about 4 minutes after she gave her first signal, when probably about 150 or 200 yards westerly from the westerly Gedney buoys; and that during this interval the Alvena had been porting from her previous course in the middle of the Swash channel, after passing abreast of buoy S. 2; and that the Queen had starboarded so as to go a little south of the middle line of Bay Side cut.

14. A glance at the chart will show that upon those courses the misunderstanding of signals should have been quickly recognized. The Queen's testimony is that during the interval after the first signals, the Alvena continued upon about the same bearing of two to three points on the Queen's starboard bow until reversal, when, as I find, the vessels were within 400 or 500 yards of each other. This of itself is sufficient to convict the Queen of most unreasonable persistence on a dangerous course, and of failure to observe inspectors' rule 3. The duty rested primarily with the Queen to keep out of the way of the Alvena, because they were heading on crossing courses, and the intent of either was not certainly known

to the other. Neither the danger of collision, nor the duty of the Queen to keep out of the way, was terminated by the mere giving of whistles, nor by the Queen's mere understanding that each was to go to port and thus avoid any crossing of courses. The danger, and that duty, could only be terminated, even apparently, by appropriate, timely and visible maneuvers, such as could be seen to be likely to be effective. Until such maneuvers were apparent, the risk of misunderstanding was upon the Queen, and her duty of vigilance in observing all the rules of navigation was in no way relaxed. By the signal of two blasts, the Alvena was understood to be going out by way of Gedney channel; and by the time the Queen had come abreast of the Cage buoy, and being then at least 200 or 300 yards to the southward of it, the Alvena upon that understanding should have changed her bearing at least two points more off the Queen's starboard bow, and also have visibly changed her course to the eastward. The fact that the bearing off the Queen's bow did not increase, but rather diminished, and that her course was not visibly altered to the eastward, ought to have been conclusive evidence to the Queen when the Cage buoy was abeam and the vessels over two-thirds a mile apart, that there was a misunderstanding, or at least that the Alvena's course was not understood, and that the Queen's signal should be repeated. The Queen's officers say she did repeat it at that time, but for the reasons above stated, I am satisfied that this was not done until much later, when the vessels had approached within less than a quarter of a mile of each other, and the Queen in the interval had herself gone at least a quarter of a mile to the westward of the Cage buoy, all the time gathering full speed. Considerably before this the obligation of inspectors' rule 3 became imperative to reverse in order "to reduce speed immediately to bare steerage way" until all doubt was removed. Still earlier, and when the Cage buoy was abeam, the Queen, as I have said, had sufficient notice of the want of a common understanding, because there had been no obstacle to the Alvena's starboarding immediately upon the exchange of signals; and because any delay by her in going to port was not only creating difficulty and increasing the risk of collision, but was carrying her further to the southward and unnecessarily out of her own direct way to Gedney channel, and was therefore very unnatural navigation. At that time the vessels were each probably about 800 or 900 yards from the place of collision and about 1,400 yards from each other. Had either observed rule 3 at that time, or soon after when within half a mile of each other, plainly the collision would have been avoided. Neither did so. The Queen continued on for about a quarter of a mile further before undertaking to comply with the rule, the bearing of the Alvena off the Queen's starboard bow growing all the time less instead of more, and indicating the close approach of danger; and when the Queen reversed suddenly and at her full capacity of 80 revolutions, at less than a quarter of a mile from the Alvena, collision could not be avoided. The rule was incumbent on both alike, and the delay in attempting to observe it, was at the risk of each. The delay, so far

as I can perceive, was without any justifiable excuse; and I must, therefore, hold the Queen liable for the whole cargo damage, the Alvena not being a party to the suit. The Atlas, 93 U. S. 302. Decree accordingly with costs.