In re CENTRAL R. R. OF NEW JERSEY.

(District Court, S. D. New York. March 3, 1899.)

1. COLLISION—STEAMERS MEETING HEAD AND HEAD—SIGNALS.

The Catskill and the St. Johns, side-wheel steamers, met in North river in the evening. The Catskill was going up at a speed of about 10 knots, and the St. Johns coming down at a speed of about 13 knots. Both carried the regulation lights. When about one-third of a mile apart, the Catskill gave the signal for passing to the left, which was at once contradicted by the St. Johns. Both vessels sheered to the westward, and the same signal was again given and contradicted. Both vessels then reversed, but a collision followed almost immediately, in which the Catskill was sunk. Each vessel claimed that when the signals were first given the other was further to the eastward. *Held*, that the evidence established that the vessels were approaching about head and head, and the Catskill was in fault for not passing to the right, as required by the rules, and also in, further violating the rules by failing to reduce speed to bare steerageway at once, on the first contradiction of her signal, both of which faults were material.

2. SAME—DELAY IN GIVING SIGNALS.
The St. Johns was also in fault, as well as the Catskill, for failing to observe inspectors' rules 1 and 6, requiring signals to be given when the vessels were approaching within a half mile of each other; which fault, in view of the speed with which the vessels were approaching and under the other circumstances of the case, could not be excused nor held immaterial.

In Admiralty. Collision.

De Forest Bros. (Harrington Putnam, of counsel), for petitioners and the St. Johns.

Benedict & Benedict, for the Catskill and New York Steamboat Co.

G. Washbourne Smith and Avery Cushman, for Leonard R. Miller.

J. Newton Williams, for Nellie McCree, George F. Cook, and Catherine A. Timmerman.

Leon Abbett, for Michael F. Morris and Herman Klein, administrators, and Hannah Klein and Herman Klein.

Leroy S. Gove, for St. Paul Fire & Marine and Providence Washington Ins. Cos.

BROWN, District Judge. The above petition for a limitation of liability, arose from a collision between the petitioners' steamboat St. Johns and the steamer Catskill, which occurred in about the middle of the North river off Fifty-Seventh street, at about 7:10 p. m. of September 15, 1897, by which the Catskill was almost immediately sunk, and became a total loss, and some of the passengers were drowned and others wounded.

Both boats were side-wheel steamers; the night was clear, or nearly so; the time was an hour after sunset, so that it was nearly or quite dark, and both vessels had their regulation lights set. The Catskill had left Christopher street on one of her usual trips, bound for Catskill with passengers and freight; and soon after leaving her slip she rounded up in her usual course in the ebb tide in about mid-river. Although the tide had been making flood for nearly two hours, the current on the surface had still about an hour to run ebb; and at the time of collision the current was running down at the rate of about one knot per hour. See The Ludvig Holberg, 36 Fed. 917, note. Against this moderate ebb current, the Catskill was going up at the rate of about 10 knots by land. The St. Johns had on that day taken an excursion party of upwards of 1,200 passengers to Newburg, and was returning to New York. Most of the way down river she had had a two-knot ebb current in her favor; and reckoning from the time she left West Point to the time of collision, her average speed was nearly 16 statute miles; so that just prior to her reduction of speed, shortly before collision, I find she was going at the rate of about 15 statute miles or 13 knots per hour. Neither steamer checked her speed until the two were within less than a third of a mile of each other. Each vessel on seeing the other sheered to the westward, and the collision took place at an angle of about $2\frac{1}{2}$ points, the stem of the St. Johns striking the starboard bow of the Catskill about 10 feet from the latter's stem and penetrating obliquely into her hull about 30 feet, crossing the Catskill's keel by a few feet, and making a complete wreck of this portion of the steamer.

Many claims for loss and damage have been interposed; but upon the present hearing the only questions litigated have been whether the St. Johns or the Catskill, or both, were to blame for the collision. The testimony is extremely conflicting as respects the first signal whistles given, the lights first seen, and the relative positions of the two vessels in the river as they approached each other. The officers of each testify that their own steamer sheered to the westward, because the other steamer was more to the eastward, that is, nearer to the New York shore, so as to give more room to pass, and each kept her sheer until collision. The Catskill's officers affirm that the St. Johns' green light was seen from 1 to 2 points on the Catskill's starboard bow, and that the Catskill's green light ought to have been seen on the St. Johns' starboard bow; while the St. Johns' witnesses testify that the Catskill's red light was seen upon the St. Johns' port bow, so that the Catskill should have seen the St. Johns'·red light on the Catskill's port bow.

The Catskill, again, contends that she first gave a signal of two whistles to the St. Johns, to which the latter replied with one; whereupon her signal of two whistles was repeated, to which the St. Johns again replied with one long whistle, followed immediately by several alarm whistles, whereupon the Catskill gave an alarm whistle, and collision speedily followed. The St. Johns contends that no whistle, previous to her whistle of one blast, was given by the Catskill, or that, if it was given, it was not heard; the subsequent whistles being substantially the same as above stated. The duties of the two steamers to each other depended, however, upon their relative positions and headings, rather than upon any mere priority of whistles; although doubtless upon the near approach of steamers their whistles become important. But upon careful consideration of the testimony I am satisfied that the Catskill gave her first signal of two whistles about a couple of seconds before the St. Johns gave her signal of one whistle; and that the Catskill's signal was not heard upon the St. Johns, for the reason that its sound reached the Catskill just at the moment when her own signal was sounded. All the other whistles were heard upon the St. Johns. There is no other apparent reason why the Catskill's first signal should not have been noticed as well, since the St.·Johns was evidently observing the Catskill, as is evidenced by her own signal to the Catskill at about the same time. The evidence also indicates the above explanation. The distance of the steamers apart would require a little less than two seconds for sound to traverse it; and both the master and the pilot of the Catskill testify that the one whistle from the St. Johns was heard "one or two seconds" or a "couple of seconds" after the Catskill's first signal was given. If this is correct, the Catskill's signal would not have been audible on the St. Johns, because drowned by the St. Johns' whistle given just as the sound of the Catskill's signal reached her. Two other witnesses from the Catskill also testify that the St. Johns' one whistle was heard "right away" after the Catskill's first signal; and the pilot's testimony with reference to slowing down, plainly agrees with this. He says that he slowed down "when about quarter of a mile from the St. Johns. Q. Was that before the second two

whistles? A. Yes, right after I blew the first two whistles. They contradicted my whistles. I slowed her down right away and blew two whistles more."

I find, therefore, that no blame attaches to the St. Johns for not hearing the first signal from the Catskill.

A careful consideration of the independent testimony, as well as the cross-examination of the witnesses on board the two steamers, satisfies me that the collision was very nearly abreast off Fifty-Seventh street; that when the Catskill blew her first signal of two whistles her stem had reached Fifty-Fourth street, and the St. Johns' stem Sixty-First street, the vessels being then about 600 yards apart. That the Catskill must have been considerably above Fiftieth street when her first signal was blown, is evident from the testimony of her two witnesses from the tug Crosby, which passed about 100 feet astern of the Catskill in mid-river in crossing to Fiftieth street. The last alarm whistles were sounded when the steamers were within 200 or 250 yards of each other and when the Crosby had just reached the Fiftieth street dock; the Crosby had after crossing the stern of the Catskill in mid-river, about off Forty-Sixth street, traveled a distance of about 2,000 feet, and the Catskill, a faster steamer, must have traveled considerably more than that distance in the same time. This would have brought her stem nearly to Fifty-Sixth street when her alarm was sounded; and as the two steamers were then only about 600 feet apart, the Catskill traversed about 250 feet of it up to collision. The position off Fifty-Fourth street, when the Catskill's first whistle was given, is also the mean in the estimates given both by her pilot Turner, and by her wheelsman, Hitchcock. The position of the St. Johns at her first whistle is shown by the testimony of her witnesses from the shore at Sixtieth and Sixty-Fifth streets. Several witnesses moreover locate the collision off Fifty-Seventh street, and the above positions accord well with the relative speed of the steamers, as indicated by the testimony.

As respects the extreme conflict in regard to the relative positions of the two vessels in the river and as to which of them was to the eastward of the other, the conclusion to which I have come by going backwards from the collision itself, guided by what was done by each and by other circumstances established by the testimony, is that there was very little difference in the distances of the two vessels from the New York shore; that they were meeting virtually head and head, or nearly so, and fell within the first branch of rule 1 of the inspectors, which requires each vessel in such a situation to turn to the right.

The direct testimony as well as the damage to the St. Johns, shows that the angle of collision was about $2\frac{1}{2}$ points. This angle was produced by the sheer of both vessels to the westward from their previous courses about straight up and down river. Both turned to the westward at about the same time, and the sheer of each was maintained without any further change of her wheel up to the moment of collision. The angle of collision is so small that it is not very material whether each contributed to it equally, or whether the Catskill sheered a point and the St. Johns, a larger vessel, a point

and·a half. As the St. Johns ran faster than the Catskill, her sheer was probably somewhat more than that of the Catskill. The latter ran the distance of less than three streets under a starboard wheel, while the St. Johns ran less than four streets under a port wheel. In making so small a change of heading as a point or a point and a half in running those distances, the difference in the distance that each would make to the westward of the line of her previous course would be less than 50 feet; so that when their first whistles were given they could not have been more than 50 feet out of line with each other. This is less than half the arc over which both colored lights are usually visible at a distance of 600 yards; and within that arc vessels are to be deemed nearly "head and head," since each would show both her colored lights to the other, if as each contends, and as the testimony shows, each was previously heading on a line up and down river.

· Other circumstances in the testimony corroborate this position of the two steamers. The wheelsman on the Catskill who looked up very shortly after her first whistle, saw only the St. Johns' red light, while the pilot noticed her green light only. The inference is that both were visible, as the St. Johns had not had time during this short interval to change both her lights by porting. The testimony of Turner, the pilot of the Catskill, though much confused and inconsistent, states that he was intending to go to the eastward of the steamship New York, which was anchored on the edge of the anchorage ground near mid-river, off Sixty-Fifth street. The St. Johns coming down had passed within 100 feet east of that vessel. These courses would necessarily bring the two steamers nearly head and head. The Catskill could not have been heading materially to the westward of the St. Johns' course, nor enough to hide her red light, if she was going to the eastward of the anchored steamer. Turner, moreover, notwithstanding his statement that he saw the St. Johns' green light one or two points on his starboard bow, in placing the models to show the position of the two vessels, placed her, as appears in the testimony before the coroner, directly ahead of the Catskill; and again he gave the direction by compass of the St. Johns from him as N. N. E. and stated that that also was his own compass course. Had the St. Johns, moreover, been well over towards.the New York shore as the pilot Turner and some others say, it would evidently have been impossible for her to reach the Catskill and strike her at the small angle of only a couple of points west of a line up and down river. Had she been as Turner says a couple of points on his starboard bow, she would have been, when 600 yards distant, more than 500 feet to the eastward of the Catskill's course; and in that case, or if a third of that distance to the eastward, the Catskill would not naturally have turned to the westward at all.

I have no doubt, therefore, that the St. Johns was heading for the Catskill, or at least not one-fourth of a point away from· her; and that the red light of the Catskill was seen on the St. Johns as the three witnesses in her pilot house testify they were seen, though not off on the port bow, but head and head, or nearly so. The testimony of pilot Witherwax that the Catskill's red light was about two

points on his port bow, is as manifestly erroneous as the testimony of the pilot Turner that the St. Johns' green light was two points on his starboard bow; and Witherwax's location of the light is wholly inconsistent with his testimony in explanation of his giving one whistle and porting, viz.: "That is what two boats are supposed to do approaching head and head."

That situation I find to be the true one at the time when the whistles were given. It is possible that the situation of the two steamers as respects each other may have been a little different when they were first visible and really first noticed, that is, at a time more or less anterior to signaling.

1. I must find, therefore, that the Catskill was to blame for sheering to the westward when the two vessels were approaching nearly head and head; that she was further to blame for not reversing at once in order to conform to the intent of inspectors' rule 3, under such circumstances, so as to bring her speed immediately "to bare steerageway" after she heard the one whistle from the St. Johns so near, and contradicting her first signal of two whistles, instead of waiting until a further contradiction of whistles before reversing. The British Queen, 89 Fed. 1003, 1008. Her persistence in giving two whistles a second time is the more blamable, because the vessels were then plainly much less than a quarter of a mile apart; and the contradictory whistle of the St. Johns came so quickly after the Catskill's first signal that no important change by the Catskill could have intervened to prevent her going to the eastward under a port wheel, nor was there any circumstance that made persistence in her westward sheer necessary. She was still further to blame for giving no attention to the range lights of the St. Johns, which would have shown to the pilot that the St. Johns was approaching nearly head and head, and that he was, therefore, bound by rule 1 to go to the right, instead of to the left. These faults are all material, since they plainly brought on the collision. Had the Catskill simply kept her course, the collision would have been avoided through the St. Johns' sheer to the westward by the porting which she began at the time her first whistle was given.

2. Neither the St. Johns nor the Catskill observed the requirements of inspectors' rules 1 and 6, to signal each other when approaching within half a mile of each other. Instead of signaling as required when 1,000 yards apart, signals were delayed by each until the vessels were only 600 yards distant. On the Catskill's part this was not from any lack of earlier notice of the St. Johns' approach, as the pilot says he first noticed the latter's lights when she was much further up river. The pilot of the St. Johns also says that he first saw the Catskill when he was about off Sixty-Eighth or Seventieth street (pages 11, 21), which was a quarter of a mile above his position when he first signaled. He did not testify on the trial that his first whistle was blown immediately on seeing the Catskill. If he had so testified, it would have convicted the St. Johns of an insufficient lookout. The mate who was acting as lookout forward on the St. Johns, made no report of the Catskill, and in his testimony before the coroner he stated that he saw only her white light. Before me,

Witherwax testified that his first whistle was blown "a few seconds, I can't tell how long," after the Catskill's light was seen.

I do not find any other fault in the St. Johns than in not signaling earlier; since she saw the Catskill earlier, or ought to have done so, and I have no doubt did see her at least half a mile distant. She was proceeding in a proper place in the river; she gave the proper signal of one whistle, though it was much delayed. She turned, accordingly, to the right, and no collision would have happened but for the wrongful maneuver of the Catskill in turning to the left. But the Catskill's sheer was prior to the St. Johns' signal, and would doubtless have been prevented by an earlier signal from the St. Johns. Under these circumstances can the St. Johns' delay in signaling be held immaterial, and too remote to be considered as contributing to the collision?

As an excuse for not signaling earlier it is argued that the atmosphere was somewhat hazy, and that the Catskill's lights may have been poor. Upon the evidence, however, no weight can be allowed to these suggestions. The pilot says there was no trouble in seeing. Other lights were well seen, both on vessels and on both shores of the river. None of the pleadings charge any insufficiency in the Catskill's lights, nor state any obscurity of the atmosphere.

Common experience, however, shows that vessels navigating the North and East rivers continually disregard the requirement to give signals at a distance of half a mile from each other. In many cases it would doubtless be useless or impracticable to give signals at that distance, on account of the presence of so many other vessels intervening. In the present case there was no such excuse. Pilots often also give as a reason for omitting the required signals, that they consider signals unnecessary, as in The City of Norwalk, 55 Fed. 101. In this case no reason is assigned by the pilots for their delay. What can be said for the St. Johns here, and all that I think can properly be said for her in this regard is, that her signal was given soon enough provided the Catskill perceived immediately what she ought to do, and made no mistake in observation, nor any error in judgment or in understanding the requirements of the rule. The Catskill was not thus exact in observation, nor instant in a correct appreciation of the position, or in the performance of her duty; and collision resulted. Can the St. Johns' nonobservance of the rule be for that reason held immaterial and remote? A faithful application of the rule according to its true intent and purpose, seems to me not to permit this. The purpose of signals is to come to a common understanding and to prevent mistakes, whether slight or gross. The Connecticut, 103 U. S. 713; The Ice King, 52 Fed. 896, affirmed in 21 C. C. A. 49, 74 Fed. 656; The T. B. Van Houten, 50 Fed. 592; The City of Norwalk, 55 Fed. 101, affirmed in 9 C. C. A. 521, 61 Fed. 367. To be effective and to accomplish their purpose they must be timely, i. e. in season to permit such care and coolness in observation and judgment as are necessary to prevent or correct mistakes. The half-mile limit was here short at the best, for vessels approaching at such speed. The St. Johns was coming down at the rate of 15 statute miles, or about 13 knots per hour; the Catskill,

going up at the rate of 10 knots. They were approaching each other, therefore, at the rate of about 2,300 feet a minute. Collision happened within a minute after the first signals were given, and both lives and property were thereby lost. The first cross whistles occurred by accident, and not by design. The mistake should have been corrected, and doubtless would have been, had there been time for care and deliberation. But after the cross whistles were heard, the vessels were but a quarter of a mile from each other, and there was scant time for deliberation in observation or judgment. At the speed of these vessels, half a nautical mile would be covered in less than a minute and a half—an interval it would seem sufficiently brief for care and deliberation in the maneuvers necessary to avoid collisions at night. Some space limit is necessary to make the rule of any use at all. The half-mile limit has been prescribed, and that is of the essence of the rule. Had these same whistles been given by both vessels when half a mile apart, instead of but little above a quarter of a mile, there would not only have been time and space for the correction of errors, but the very maneuvers which were in fact taken by both boats in stopping and backing after the second contradiction in whistles, would have avoided the collision. This, as I understand, is the most exact test, whether a requirement is material or not. Here the delay in signaling was material, because it was this very delay that rendered those maneuvers ineffectual. As observed in The Niagara, 77 Fed. 329, affirmed in 28 C. C. A. 528, 84 Fed. 902, collision is the greatest peril to life and property in modern navigation; and if proper signals are not given, all freight and passenger traffic is put in peril. Considering the inevitable hazards that must attend navigation at such speed unless timely signals are given, I cannot feel justified in sustaining any such relaxation of the essential terms of this rule as would largely destroy its usefulness, and make its application always uncertain. In the absence of circumstances justifying delay, the safety of life and property seems to me absolutely to demand that vessels shall be held to the duty of signaling at the required distance whenever practicable, or else take the risk of making good the damage, if loss ensue. The other faults of the Catskill do not make this fault immaterial in either vessel.

Both vessels must therefore be held to blame. The owners of the St. Johns are entitled to the usual decree in limitation of liability.